**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| GOVERNMENT ACCOUNTABILITY PROJECT,<br><br>Plaintiff,<br><br>v.<br><br>U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES; U.S. FOOD AND DRUG ADMINISTRATION,<br><br>Defendants. | ) | Civil Action No. 07-01702 (CKK) |

**DEFENDANTS' MOTION FOR AN OPEN AMERICA STAY AND OPPOSITION TO PLAINTIFF'S MOTION FOR JUDGMENT ON THE PLEADINGS**

Pursuant to 5 U.S.C. § 552(a)(6)(C), Defendants U.S. Department of Health and Human Services and the U.S. Food and Drug Administration, by and through their undersigned counsel, respectfully move to stay the proceedings in this action. Although the Defendants are exercising due diligence to respond to Plaintiff's FOIA request, exceptional circumstances – as explained in detail in the accompanying memorandum – have prevented the agency from processing the request within the statutory time limit. Accordingly, Defendants request entry of an eighteen month stay of the instant proceedings (i.e., to August 19, 2009), to allow Defendants sufficient time to process Plaintiff's request. On the bases of those reasons supporting the entry of a stay, Defendants also oppose Plaintiff's Motion for Judgment on the Pleadings.

In accordance with Local Civil Rule 7(m), Defendants sought Plaintiff's position on this motion, and Plaintiff opposes the motion. A supporting memorandum of points and authorities and proposed order are attached.

Dated: February 19, 2008

Respectfully submitted,

/s/ Jeffrey A. Taylor /dvh

_________________________

JEFFREY A. TAYLOR, D.C. BAR #498610
United States Attorney

/s/ Rudolph Contreras

_________________________

RUDOLPH CONTRERAS, D.C. BAR #434122
Assistant United States Attorney

/s/ Beverly M. Russell

_________________________

BEVERLY M. RUSSELL, D.C. BAR #454257
Assistant United States Attorney
U.S. Attorney's Office for the District of Columbia,
Civil Division
555 4th Street, N.W., Rm. E-4915
Washington, D.C. 20530
Ph: (202) 307-0492
Fax: (202) 514-8780
E-mail: beverly.russell@usdoj.gov

Of Counsel:

JAMES C. STANSEL
Acting General Counsel

GERALD F. MASOUDI
Associate General Counsel
Food and Drug Division

ERIC M. BLUMBERG
Deputy Chief Counsel, Litigation

SHOSHANA HUTCHINSON
Associate Chief Counsel, Litigation
U.S. Dept. of Health & Human Services
Office of the General Counsel

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| GOVERNMENT ACCOUNTABILITY PROJECT,<br><br>Plaintiff,<br><br>v.<br><br>U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES; U.S. FOOD AND DRUG ADMINISTRATION,<br><br>Defendants. | ) | Civil Action No. 07-01702 (CKK) |

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANTS' MOTION FOR AN OPEN AMERICA STAY AND OPPOSITION TO PLAINTIFF'S MOTION FOR JUDGMENT ON THE PLEADINGS**

**INTRODUCTION**

Plaintiff brought this action against Defendants, the United States Department of Health and Human Services and the United States Food and Drug Administration ("FDA") pursuant to the Freedom of Information Act, 5 U.S.C. § 552 ("FOIA"). Compl. ¶ 1. The complaint pertains to Plaintiff's June 27, 2007 FOIA request for documents related to "the clinical studies submitted regarding the drug Ciprofloxacin." Compl. ¶ 6. Although FDA is exercising due diligence in responding to Plaintiff's FOIA request, exceptional circumstances have prevented it from processing the request within the statutory time limit.

FDA therefore moves for a stay of proceedings, and opposes Plaintiff's Motion for Judgment on the Pleadings, pursuant to Open America v. Watergate Special Prosecution Force, 547 F.2d 605 (D.C. Cir. 1976), to allow the agency to complete its processing of Plaintiff's FOIA request. FDA is submitting sworn declarations from Frederick J. Sadler, Director of the Division

of Freedom of Information ("DFOI")[1], Office of Management Programs, and Nancy B. Sager, Director of the Division of Information Disclosure Policy ("DIDP"), Center for Drug Evaluation and Research ("CDER"), in support of this motion that demonstrate exceptional circumstances exist that make a stay of proceedings appropriate under Open America. Accordingly, Defendants respectfully request that the Court stay all proceedings in this matter for eighteen months (i.e,. to August 19, 2009) to allow FDA sufficient time to produce all documents responsive to Plaintiff's FOIA request. Thereafter, Defendant will submit a dispositive motion for this Court's adjudication.

## STATEMENT OF FACTS

A. Plaintiff's FOIA Request

On June 28, 2007, FDA's DFOI received a FOIA request from Plaintiff dated June 27, 2007. See Declaration of Frederick J. Sadler ("Sadler Decl.") ¶ 10 (Feb. 4, 2008).[2] This request sought documents concerning clinical study data regarding the drug Ciprofloxacin. See Declaration of Nancy B. Sager ("Sager Decl.") ¶ 28.[3] DFOI logged in the request and assigned it reference number 2007-6023, reflecting that it was the 6023rd FOIA request received by FDA in 2007. Sadler Decl. ¶ 10. That same day, FDA sent Plaintiff a letter acknowledging receipt of the

[1]The following acronyms are used throughout this memorandum:
CDER: Center for Drug Evaluation and Research
DFOI: Division of Freedom of Information (FDA's main FOIA office)
DIDP: Division of Information Disclosure Policy (component of CDER)
FDA: Food and Drug Administration
FDAAA: Food and Drug Amendments Act of 2007
NDA: New Drug Application

[2] References to "Sadler Decl." are to the declaration of Frederick J. Sadler filed concurrently with this motion.

[2] References to "Sager Decl." are to the declaration of Nancy B. Sager filed concurrently with this motion.

request, notifying Plaintiff that FDA would respond to the request "as soon as possible," and inviting Plaintiff to contact FDA with any questions related to the request ("acknowledgment letter"). Id. ¶¶ 9, 11.

Given the size of FDA and the vast number of documents generated in the ordinary course of agency business, DFOI forwards requests made under the FOIA to those FDA offices that it determines are reasonably likely to possess responsive records.[4] Id. ¶ 7. In this case, because CDER has regulatory responsibility for Ciprofloxacin, DFOI immediately forwarded Plaintiff's request to DIDP, the division in CDER responsible for information disclosure. Id. ¶ 12; Sager Decl. ¶ 28.

On June 29, 2007, DIDP received Plaintiff's request and assigned it to the "complex queue" which refers to the queue of requests that cannot be answered quickly with readily available documents that require no redacting. Sager Decl. ¶¶ 28-29. Plaintiff's request is still pending in DIDP's complex queue and will be processed as soon as it rises to the head of the queue. Id. ¶¶ 29, 38.

By letter dated July 3, 2007, Plaintiff noted receipt of FDA's "acknowledgment letter" and requested further information on when FDA would provide responsive documents. Compl. ¶ 9. On August 3, 2007, Plaintiff submitted an appeal of FDA's "constructive denial" of Plaintiff's FOIA request. Compl. ¶ 10.

On August 6, 2007, the Department of Health and Human Services Public Health Service notified Plaintiff that its administrative appeal had been received and that it had been assigned

[4] FDA regulates more than $1 trillion of commerce each year. Its jurisdiction includes drugs, foods, animal feeds, biologics, veterinary medicines, and medical devices. A byproduct of the wide scope of the agency's activities is a massive volume of FOIA requests. Sager Decl. ¶ 15.

number PHS-2K7-A-122. Compl. ¶ 11. On September 25, 2007, Plaintiff filed its Complaint in this case, and on January 29, 2008, filed a Motion for Judgment on the Pleadings. To date, FDA has neither denied, nor issued to Plaintiff a letter denying, its request for records; Plaintiff's FOIA request is still pending at DIDP and will be processed when it rises to the head of the "complex" queue. Sager Decl. ¶¶ 29, 38.

B. System for Processing FOIA Requests Used By DIDP

Initially, all FOIA requests for FDA documents are received by FDA's main Freedom of Information office, DFOI. DFOI logs in each request, assigns it a reference number, and routes it to the agency component(s) responsible for records relevant to the request. Sadler Decl. ¶¶ 6-7. CDER is the center within FDA that is responsible for the regulation of most human drugs and therapeutic biological products. FOIA requests referred to CDER are sent to DIDP. Sadler Decl. ¶ 12; Sager Decl. ¶ 7. DIDP consists of twenty-eight people: a Director, one Special Assistant, three team leaders, eleven regulatory counsels, four consumer safety officers, five paralegals, and three project specialists. Sager Decl. ¶ 6. In addition, DIDP currently employs two full-time contractors who assist in producing documents in litigation matters, reviewing documents, and processing FOIA requests. Id.

Requests that can be answered quickly with readily available documents and that require no redacting are considered "simple" requests and generally are processed on a fast track (the "Simple Track"), as opposed to "complex" requests, which follow a slower processing track (the "Complex Track"). Sager Decl. ¶ 8. DIDP staff generally process requests within the Simple and Complex Tracks on a first-in, first-out basis. Id.

Simple requests do not require DIDP personnel to redact documents, generally because DIDP has already reviewed and redacted the responsive documents, the documents requested are

publicly available, or it is apparent from the face of the request that the documents do not exist in CDER's records.[5] Sager Decl. ¶ 9. DIDP's response to a request in the Simple Track principally involves making copies of previously processed documents and providing them to the requester, directing the requester to publicly available documents, or providing the requester with a statement that CDER does not have documents responsive to the request. Id. ¶ 10. If some portion of a request is simple and the rest of it is complex, the simple portion of it may be assigned to the Simple Track, and the complex portion assigned to the Complex Track. Id. ¶ 9.

Any requests that are not considered simple are placed in the Complex Track. Generally, as requests move towards the head of the Complex Track, they are assigned to a specific DIDP employee for processing. Sager Decl. ¶ 11. However, if DIDP anticipates that a FOIA request in the Complex Track will require extensive searches for numerous documents in different locations, then multiple individuals in DIDP are assigned to the request. Id. Complex requests that require this level of staffing often involve voluminous records and frequently necessitate extensive time for searching and redaction in order to prepare the records for release. Id. Furthermore, such requests often require substantive input from supervisory staff to determine both the scope of the search and the ultimate releasability of the records. Id. To promote efficiency in its operations, DIDP has developed a system whereby once a request for certain records comes to the top of the Complex Track, responses to requests (or portion(s) of requests) seeking the same, or closely related, records are processed at the same time. Id. This means that some requesters whose requests are farther back in the queue may initially receive only a partial

[5] Documents may fall into this category because, for example, they have been assembled and redacted in response to a prior FOIA request or because the request involves a drug approval package that DIDP has already finished processing in preparation for its posting on FDA's website. Sager Decl. ¶ 9.

response to their requests, but it permits DIDP to more effectively use its limited resources in providing at least some documents to those requesters earlier than they might otherwise have received them. Id.

For requests in the Complex Track, DIDP may need to search, or contact individuals and direct them to search, numerous agency files. Sager Decl. ¶ 12. After the search has been carried out and the documents have been sent to DIDP, DIDP conducts a preliminary review of the records collected to verify that they are responsive to the request. Id. DIDP then conducts a page-by-page, line-by-line review of the responsive documents to determine whether the records can be released and whether any FOIA exemptions apply. Id. Any exempt material is redacted. Id. Frequently, a team leader conducts a quality control review to ensure that the responsive documents have been properly prepared for public disclosure. Id. This review ensures that the FOIA exemptions have been properly applied and that no material meriting protection will be released. Id. Finally, copies of the responsive documents, as redacted, are prepared and delivered to the requester. Id.

If the documents are being prepared in response to a complex request that is the subject of litigation (such as Plaintiff's request), all responsive documents are bates-stamped and indexed before the review and redaction process begins. Sager Decl. ¶ 13. After the review and redaction process is completed, DIDP staff prepare a Vaughn index explaining what has been redacted or withheld from disclosure. Id.

It is not always efficient to complete one request before moving on to the next. Sager Decl. ¶ 14. DIDP personnel therefore often work on more than one request at a time. Id. Processing of a complex request may be delayed for a variety of reasons, such as resolving which exemptions apply, locating missing records, or consulting with other government agencies about

the propriety of releasing certain documents. Id. In the interest of efficiency during this waiting period, the next request in the track may be processed and, if work on it is completed, the responsive records will be released at that time. Id. Therefore, large requests often proceed alongside smaller requests in the Complex Track to reduce the processing time for many FOIA requests, making the most effective use of DIDP's time and resources. Id.

**ARGUMENT**

A. Legal Standard for a Stay of Proceedings

The FOIA contains a general standard which provides that federal agencies must respond to document requests within twenty working days. 5 U.S.C. § 552(a)(6)(A)(i). Courts may, however, "allow the agency additional time to complete its review of the records" upon a showing that "exceptional circumstances exist and that the agency is exercising due diligence in responding to the request." Id. § 552(a)(6)(C)(i).

In construing this provision of the FOIA, the D.C. Circuit, in Open America, held as follows:

> we interpret Section 552 (a)(6)(C) to mean that "exceptional circumstances" exist when an agency . . . is deluged with a volume of requests for information vastly in excess of that anticipated by Congress, when the existing resources are inadequate to deal with the volume of such requests within the time limits of subsection (6)(A), and when the agency can show that it "is exercising due diligence" in processing the requests. In such situation, in the language of subsection (6)(C), "the court may retain jurisdiction and allow the agency additional time to complete its review of the records." Under the circumstances defined above the time limits prescribed by Congress in subsection (6)(A) become not mandatory but directory. The good faith effort and due diligence of the agency to comply with all lawful demands under the Freedom of Information Act in as short a time as is possible by assigning all requests on a first-in, first-out basis, except those where exceptional need or urgency is shown, is compliance with the Act.

547 F.2d at 616; see also Appleton v. FDA, 254 F. Supp. 2d 6, 8-9 (D.D.C. 2003) ("exceptional circumstances" include "any delays encountered in responding to a request as long as the agencies are making good-faith efforts and exercising due diligence in processing requests on a first-in, first out basis." ). In other words, "exceptional circumstances" include delays encountered when an agency is "deluged with a volume of requests for information vastly in excess of that anticipated by Congress, . . . the existing resources are inadequate to deal with the volume of such requests within the time limits of subsection (6)(A) [5 U.S.C. § 552(a)(6)(A)], and . . . the agency can show that it 'is exercising due diligence' in processing the requests." Edmonds v. FBI, 417 F.3d 1319, 1321 n.2 (D.C. Cir. 2005) (quoting Open America, 547 F.2d at 616).[6] Thus, when an agency can show: (1) a great number of requests and inadequate resources, and (2) good faith and due diligence in complying with requests by processing them on a first-in, first-out basis, the agency is entitled to a stay of proceedings.

The issuance of orders extending the time to respond to FOIA requests is not uncommon. See, e.g., Elec. Frontier Found. v. United States Dep't of Justice, 517 F.Supp.2d 111, 120-21 (D.D.C. 2007) (granting a stay of nearly two years, with the possibility of an extension); Elec. Privacy Info. Ctr. v. United States Dep't of Justice, 2005 U.S. Dist. LEXIS 18876, *12 (D.D.C. Aug. 31, 2005) (giving the FBI a stay until August 31, 2005 to respond to a FOIA request originally dated June 22, 2001, and clarified by letter dated August 8, 2001); Piper v. United States Dep't of Justice, 339 F. Supp. 2d 13, 16 (D.D.C. 2004) (discussing a stay of two years given to the FBI); Appleton, 254 F. Supp. 2d at 11 (granting FDA's motion for stay pending

[6] "Exceptional circumstances" permitting the granting of additional time do not include delays resulting from a "predictable workload" of FOIA requests, "unless the agency demonstrates reasonable progress in reducing its backlog of pending requests." 5 U.S.C. § 552(a)(6)(C)(ii).

completion of search and production of documents); Judicial Watch of Florida, Inc. v. United States Dep't of Justice, 102 F. Supp. 2d 6, 9 & n.1 (D.D.C. 2000) (discussing an order giving the FBI until June 8, 2000 to respond to a request dated July 15, 1997); Emerson v. CIA, 1999 U.S. Dist. LEXIS 19511, * 4 (D.D.C. Dec. 16, 1999) (giving the State Department until September 6, 2000 to respond to a request dated three years prior); Edmond v. United States Attorney, 959 F. Supp. 1, 4 (D.D.C. 1997) (giving the U.S. Attorney's Office until April 1, 1998 to respond to a request filed August 14, 1992); Jimenez v. FBI, 938 F. Supp. 21, 31 (D.D.C. 1996) (granting FBI's request for stay and permitting it over four years to respond to plaintiff's FOIA request).

B. FDA is Entitled to a Stay

Exceptional circumstances exist in this case justifying a stay of proceedings. As demonstrated below, FDA (specifically CDER's DIDP) faces a high volume of FOIA requests and numerous document-production demands with limited resources, FDA has exercised good faith and due diligence in processing Plaintiff's request, and all FOIA requests in general, on a first-in, first-out basis, and FDA has made "reasonable progress" in reducing its backlog of pending FOIA requests.

1. DIDP Is Responding to a High Volume of FOIA and Other Document Requests With Limited Resources

The declarations submitted in support of this Motion show the substantial number of FOIA requests received by FDA and specifically CDER DIDP. FDA received 18,865 requests in calendar year 2006, and 11,400 requests in 2007, Sadler Decl. ¶ 5, with approximately twenty-five percent of all FOIA requests for FDA documents being directed to DIDP in 2007. Sager Decl. ¶ 16.

DIDP received 5,310 requests in 2003; 5,156 requests in 2004; 4,050 requests in 2005; 3,335 requests in 2006; and 2,888 requests in 2007. Id. Because CDER is the agency component responsible for the regulation of most human drugs and therapeutic biological products, many of the types of records within CDER involve information regarding the drug approval process, such as: (a) manufacturing, testing, packaging, and labeling information; (b) documents prepared by FDA relating to the decision whether or not to approve an application seeking marketing approval; and (c) patient information relating to clinical studies. Id. ¶ 19. Due to the nature of this type of regulatory work, the vast majority of CDER documents that are responsive to FOIA requests include information that is exempt from disclosure as trade secret information, confidential commercial information,[7] personal privacy information,[8] and/or deliberative process information.[9] Id.

[7] Exemption 4 of the FOIA protects from disclosure "trade secrets and commercial or financial information obtained from a person [that is] privileged or confidential." 5 U.S.C. § 552(b)(4). Moreover, the Trade Secrets Act prohibits the release of trade secret and confidential commercial information unless otherwise authorized by law. 18 U.S.C. § 1905. The Federal Food, Drug, and Cosmetic Act ("FD&C Act") also prohibits the release of trade secret information to persons other than Department of Health and Human Services employees, to Congress, or to the courts in cases brought under the FD&C Act. 21 U.S.C. § 331(j). Additionally, FDA regulations provide that trade secrets and commercial information that is privileged or confidential are not available for public disclosure. 21 C.F.R. § 20.61.

[8] Exemption 6 of the FOIA permits the government to withhold all information about individuals in "personnel and medical files and similar files" when the disclosure of such information "would constitute a clearly unwarranted invasion of personal privacy." 5 U.S.C. § 552(b)(6). Similarly, FDA regulations also provide that FDA will withhold information that would identify patients or research subjects in any medical or similar report, test, study, or other research project. 21 C.F.R. § 20.63.

[9] Exemption 5 of the FOIA permits the government to withhold information that is exempt from disclosure under the deliberative process privilege, which protects internal pre-decisional communications that are part of a government agency's decision-making process. 5 U.S.C. § 552(b)(5); see also 21 C.F.R. § 20.62.

DIDP received an average of 240 requests per month in 2007. Sager Decl. ¶ 17. However, this figure is somewhat misleading because it does not reflect the size and complexity of the requests received, or DIDP's backlog. For example, a FOIA request submitted on May 20, 2005, and assigned reference number 05-7022, sought documents concerning the drug Serc (betahistine). Id. The request reached the top of the Complex Track in November 2007. Id. DIDP identified approximately 21,000 pages of responsive documents, including: the Investigational New Drug Application ("INDA"),[10] the New Drug Application ("NDA"),[11] and approval documents for the NDA; correspondence pertaining to FDA's review and approval of the drug; and other correspondence between FDA and the manufacturer. Id. DIDP estimated at that time that processing the request would require one full-time employee approximately twenty-seven weeks to review those documents and redact exempt information. Id.

The number of FOIA requests received per month in 2007 is also deceptively low because many of the FOIA requests that DIDP receives actually contain multiple individual requests for documents. For example, a FOIA request submitted on July 30, 2007, and assigned reference number 07-6874, sought 992 individual MedWatch forms.[12] Sager Decl. ¶ 18. DIDP estimates

---

[10] An INDA is a request by a sponsor or investigator that it be permitted, pursuant to 21 U.S.C. § 355(i), to ship an unapproved drug in interstate commerce for investigational use. The main purposes of an INDA are to provide sufficient information to FDA to assure the safety and rights of the human subjects in the clinical investigations, and to help assure that the quality of those investigations is adequate to permit an evaluation of the safety and effectiveness of the drug product.

[11] An NDA is the means by which drug sponsors formally request, pursuant to 21 U.S.C. § 355(b), FDA approval to market a new drug in the United States. It includes substantial and detailed information about the safety and effectiveness of the product for its proposed indication(s).

[12] MedWatch forms (Form FDA 3500) are used by healthcare professionals, consumers, and patients for reporting to FDA serious adverse events, potential and actual product use errors,

(continued...)

that the request will require one full-time employee approximately four weeks to review those documents and redact exempt information. Id. This is due in part to the fact that MedWatch forms are frequently handwritten (and thus difficult to read), and that they contain a large amount of sensitive personal privacy information that is redacted prior to disclosure. Id. Although DIDP (like FDA as a whole) does not count in its total FOIA numbers each of the multiple requests that may be encompassed within a single FOIA request, it is not unusual for a request to contain as many as five, ten, or more separate requests for documents. Id. For example, out of the 181 requests received by DIDP in November 2007, seven contained fifteen or more requests, five contained between ten and fourteen requests, 23 contained between five and nine requests, and 30 contained between two and four requests. Id.

Congress also understood that the number of requests for records by courts, as well as size and complexity of requests being processed, and the amount of classified material involved, may be relevant to a court's determination of whether exceptional circumstances exist. See H.R. Report No. 104-795, pt. IV.B., at 18-19 (1996); see also Elec. Frontier Found., 2007 U.S. Dist. LEXIS 33396, at *14. During 2007, for example, DIDP collected, reviewed, redacted, and indexed tens of thousands of pages of documents related to multiple FOIA lawsuits, third-party subpoenas (involving cases in which FDA is not a party), and discovery requests in litigation matters in which FDA is a party. Sager Decl. ¶ 21. Although many of these document productions were in response to matters that had been pending for some time, the actual document productions were handled by DIDP in 2007. Id. These productions have required a substantial time commitment by DIDP personnel, such that DIDP has committed five full-time

[12](...continued)
and product quality problems associated with the use of FDA-regulated products.

employees to respond solely to these matters. Id. Some examples of these document productions are:

(a) In SEC v. Selden, Case No. 05-cv-00476 (D.D.C.), a third-party subpoena was served on FDA on or about October 28, 2005. The subpoena required production of documents concerning Replagal (an unapproved biologic), Transkaryotic Therapies, Inc. (the former manufacturer of Replagal), Richard Selden (the former CEO of Transkaryotic Therapies, Inc.), and Fabrazyme (an approved biologic). DIDP reviewed, redacted, and indexed approximately 12,000 pages of documents for this production.

(b) In In Re: POZEN, Inc. Securities Litigation; Case No. 1:04-cv-00505-WLO (M.D.N.C.), a third-party subpoena was served on FDA on or about August 23, 2006. The subpoena required production of documents concerning two NDAs held by Pozen, Inc. DIDP reviewed and redacted approximately 2,600 pages of documents for this production.

(c) In In Re: Forest Labs., Inc. Securities Litigation; Case No. 05-cv-2827 (S.D.N.Y.), a third-party subpoena was served on FDA on or about October 3, 2006. The subpoena required production of documents concerning the NDAs for Celexa and Lexapro. DIDP reviewed and redacted approximately 500 pages of documents for this production.

(d) In In Re: Ortho Evra Product Liability Litigation; MDL Docket No. 1742 (N.D. Ohio), a third-party subpoena was served on FDA on or about December 8, 2006. The subpoena required production of documents concerning the Ortho Evra NDA. DIDP reviewed, redacted, and indexed approximately 5,000 pages of documents for this production.

(e) In In Re: Fosamax Product Liability Litigation; MDL Docket No. 1742 (S.D.N.Y.), a third-party subpoena was served on FDA on or about February 5, 2007. The subpoena required

production of documents concerning the Fosamax NDA. DIDP reviewed, redacted, and indexed approximately 1,300 pages of documents for this production.

(f) In In Re: Seroquel Product Liability Litigation; MDL Docket No. 6:06-md-1769 (M.D. Fla.), a third-party subpoena was served on FDA on or about May 10, 2007. The subpoena required production of documents concerning the Seroquel NDA. DIDP reviewed, redacted, and indexed approximately 3,000 pages of documents for this production.

(g) In Jerome Stevens Pharmaceuticals, Inc. v. FDA; Case No. 1:02-cv-01939 (D.D.C.), a lawsuit filed under the Federal Tort Claims Act, DIDP reviewed, redacted, and indexed approximately 3,000 pages of documents to respond to discovery requests.

(h) In Bloomberg L.P. v. FDA; Case No. 06-cv-6552 (S.D.N.Y.), a FOIA lawsuit, DIDP reviewed, redacted, and indexed approximately 5,000 pages of documents.

Another huge part of DIDP's workload in the last few years has been a significant and unanticipated increase in the resources that DIDP must devote to responding to document requests made by Congress. Sager Decl. ¶ 22. Although these requests are not made under the FOIA and are not processed in the FOIA tracks, the same group of employees processes them because of the nature of the work and the need for consistency in document production. Id. These requests are also prioritized because they originate from the legislative branch. Id. Between August 2004 and August 2005, DIDP dedicated one full-time employee (with additional help from other DIDP employees as warranted) to responding to such document requests. Id. During that period, DIDP produced for Congress over 100,000 pages relating to matters including selective serotonin reuptake inhibitors (commonly referred to as "SSRIs"), COX-2 inhibitor drugs, and the participation by the elderly in clinical drug trials. Id. Between May and July 2006 alone, DIDP reviewed over 125,000 pages for production in response to a

Congressional subpoena relating to the drug Ketek. Id. This production required the full-time attention of no fewer than two, and sometimes as many as six, DIDP employees, during that three-month period; because some of these DIDP employees were pulled from other tasks to work on this production, the additional staffing for the Ketek production necessitated a corresponding decrease in staff time devoted to responding to FOIA requests. Id. As further described below, in the past twelve months, Congressional productions have continued to require a substantial time commitment by DIDP personnel:

(a) For a Congressional request for documents regarding the cardiovascular safety of Avandia, DIDP reviewed approximately 24,000 pages of documents;

(b) For a Congressional request for documents regarding FDA's approval and oversight of one approved drug, DIDP reviewed approximately 5,000 pages of documents;

(c) For a Congressional request for documents regarding drugs approved under Subpart H of FDA's regulations, DIDP reviewed approximately 10,000 pages of documents; and

(d) For a Congressional request for documents regarding Erythropoiesis-Stimulating Agents, DIDP reviewed approximately 5,000 pages of documents.

All of these Congressional document requests lead to a corresponding decrease in time DIDP staff have available to respond to FOIA requests. Id.

In addition to the foregoing, DIDP, in light of its responsibilities under the Electronic Freedom of Information Act Amendments of 1996 ("EFOIA")[13] and consistent with E.O. 13,392,[14] proactively reviews, redacts, and posts on FDA's website certain drug approval

---

[13] EFOIA Amend. of 1996, Pub. L. No. 104-231; § 7©, 110 Stat. 3048 (codified as amended at 5 U.S.C. § 552(a)(6)(C)(ii)).

[14] On December 14, 2005, the President issued E.O. 13,392, entitled Improving Agency (continued...)

packages,[15] approval letters,[16] and warning letters.[17] Sager Decl. ¶ 23. DIDP proactively reviewed, redacted, and posted on FDA's website 1,003 approval letters, 107 approval packages, and 35 warning letters in 2004; 806 approval letters, 76 approval packages, and 41 warning letters in 2005; 1,108 approval letters, 99 approval packages, and 35 warning letters in 2006; and 1,115 approval letters, 92 approval packages, and 51 warning letters in 2007. Id. Through this process of proactive review and posting, DIDP makes available tens of thousands of pages of documents each year regarding newly approved drugs, without regard for whether there is a FOIA request pending for those documents. Id. This means that individuals seeking these documents do not need to file a FOIA request to obtain them. Id. However, DIDP spends the same amount of time reviewing and redacting these documents as it would if it had been responding to a FOIA request. Id. Thus, although the number of FOIA requests decreases because of the proactive posting, there is not an equivalent decrease in DIDP's workload. Id.

---

[14](...continued)
Disclosure of Information. E.O. 13,392 encourages federal agencies to increase the dissemination of records to the public without the need for a FOIA request.

[15] A drug approval package is a compilation of (i) FDA-generated documents related to the agency's review of an application to market a new drug or biological product (i.e., an NDA or a "biologics license application" (BLA)), from the time the applicant submits the application to the time of FDA's decision regarding whether to approve the application; (ii) certain correspondence and administrative documents pertinent to the application; and (iii) final approved labeling. Because of the nature of the information frequently included in such documents (e.g., manufacturing and patient information), drug approval packages usually contain information that, even after approval of the product at issue, remains exempt from disclosure under the FOIA and is redacted prior to posting.

[16] An approval letter is an official communication from FDA to the sponsor of an NDA or BLA that allows the commercial marketing of the product.

[17] A warning letter is a written communication from FDA to a regulated entity notifying it of violations of the statutes and/or regulations that FDA enforces.

On September 27, 2007, the President signed into law the Food and Drug Administration Amendments Act of 2007 ("FDAAA"). Pub. L. No. 110-85. Among other provisions, FDAAA gave FDA new authority and obligations regarding the new drug and biologic review process and the monitoring of drug safety after products are being marketed. FDAAA also reauthorized key programs pertaining to the testing and approval of drug and biological products in children. All of these provisions of FDAAA have resulted in new or increased obligations for DIDP, some of which must be immediately implemented, and some of which must be implemented over the next six months. Sager Decl. ¶ 24. Over the past few months, six DIDP employees have been working on various projects related to the new disclosure requirements being implemented as part of FDAAA, resulting in fewer personnel resources available to process FOIA requests. Id. Some of the new disclosure obligations required by FDAAA and affecting DIDP are:

(a) FDAAA provided authority to FDA to require sponsors of NDAs to develop Risk Evaluation and Mitigation Strategies ("REMS") and established standards and procedures for requiring REMS and enforcing the requirements. It also included certain disclosure requirements and time frames related to REMS and the drug approval process. DIDP has the responsibility for ensuring that the relevant documents are reviewed, redacted, and posted in compliance with the statutory time frames.

(b) FDAAA codified the establishment of CDER's Drug Safety Oversight Board ("DSB") and provided that certain disputes over REMS will be reviewed by the DSB. FDAAA requires that FDA proactively: (i) publish on the FDA website notices of disputes within five business days of scheduling of the dispute for DSB review; (ii) review, redact, and publish transcripts of the DSB meetings within ninety days; and (iii) review, redact, and publish DSB recommendations regarding the REMS disputes within five days. DIDP has the responsibility for

reviewing, redacting, and posting the relevant documents on the agency's website in compliance with the statutory provisions.

(c) FDAAA reauthorized and amended the Best Pharmaceuticals for Children Act (BPCA), under which drug sponsors can obtain additional marketing exclusivity by conducting FDA-requested pediatric studies contained in a written request. The statute requires that FDA post on its website: (i) notices of marketing exclusivity determinations with a copy of the written request within thirty days of a determination; and (ii) review of pediatric studies within 210 days from the submission of a report. Because the BPCA provisions pertain solely to products regulated by CDER, DIDP has the responsibility for reviewing, redacting, and posting on the agency's website the relevant documents in compliance with these provisions.

(d) FDAAA reauthorized and amended the Pediatric Research Equity Act (PREA), which requires that most applications for drugs and biological products include an assessment of the product in children, unless the requirement is waived or deferred. The statutory provisions require that study reports, study information, and certain submissions be made publicly available within certain set time frames. DIDP has the responsibility for reviewing, redacting, and posting the relevant CDER documents in compliance with the statutory provisions. Id.

In summary, DIDP's current workload includes: a stream of new FOIA requests at the rate of approximately 240 per month; a backlog of approximately 3,420 FOIA requests (as of January 31, 2008); document productions for FOIA lawsuits; document production in response to subpoenas; proactive postings as part of the agency's compliance with EFOIA and E.O. 13,392; responding to requests for documents made by Congress, foreign, state and local governments, and other federal agencies; and implementing the disclosure provisions of FDAAA affecting CDER. Sager Decl. ¶ 25.

2. FDA Has Exercised Due Diligence in Processing Plaintiff's FOIA Request

The second showing that an agency must make to obtain an Open America stay is that it is making good faith efforts and exercising due diligence by processing FOIA requests on a first-in, first-out basis. The system of handling FOIA requests on a "first-in, first-out" basis has been held by courts as a sufficient showing of due diligence. See, e.g., Elec. Frontier Found., 2007 U.S. Dist. LEXIS 33396, at *22 (granting a stay based, in part, upon the FBI's first-in, first-out processing system); Appleton, 54 F. Supp. 2d at 10 (granting FDA a stay based, in part, upon FDA's "demonstrated good-faith efforts and due diligence in processing plaintiff's request on a first-in, first-out basis"); Jimenez, 938 F. Supp. at 31 (holding that two-track, first-in, first-out processing system satisfied due diligence requirement for a stay).

CDER DIDP, as a general practice, processes FOIA requests on a two-track, first-in, first-out basis. Sager Decl. ¶¶ 8-14; see also infra 4-7. Therefore, FDA has shown the due diligence necessary to obtain a stay.

In addition to exercising due diligence in its handling of FOIA requests in general, FDA has made good-faith efforts and exercised due diligence in processing Plaintiff's request since receiving it. The same day that DFOI received Plaintiff's request, DFOI sent an acknowledgment letter to Plaintiff with agency contact information and forwarded the request to the office likely to have responsive documents. Sadler Decl. ¶¶ 10-14; Sager Decl. ¶¶ 28-29. Thus, FDA has shown good faith efforts and the exercise of due diligence in processing Plaintiff's request. See Appleton, 254 F. Supp. 2d at 10.

3. FDA Has Made Reasonable Progress in Reducing Its Backlog

______Under the FOIA, a "predictable agency workload of requests" does not constitute exceptional circumstances "unless the agency demonstrates reasonable progress in reducing its

backlog of pending requests." 5 U.S.C. § 552(a)(6)(C)(ii). DIDP has made "reasonable progress" in reducing its backlog over the past four years.

As stated above, DIDP receives a vast number of FOIA requests, many of which are complex and require labor-intensive resources. DIDP processed approximately 4,340 requests in 2003; 6,800 requests in 2004; 4,876 requests in 2005; 3,907 requests in 2006; and 3,498 requests in 2007. Sager Decl. ¶ 20. Despite this rate of processing, however, DIDP has a backlog of approximately 3,420 FOIA requests as of January 31, 2008. Id. The backlog is attributable to DIDP's enormous workload, which, as noted above, consists of a constant stream of new FOIA requests; thousands of currently pending FOIA requests; document productions for FOIA lawsuits; document production in response to subpoenas; proactive postings as part of the agency's compliance with EFOIA and E.O. 13,392; responding to requests for documents made by Congress, foreign, state and local governments, and other federal agencies; and implementing the disclosure provisions of FDAAA affecting CDER. Sager Decl. ¶ 25. This workload has resulted in substantial delays in processing requests for documents. Id.

There are three primary types of organizational and work process changes that have helped DIDP reduced its backlog: (i) using new information technology systems to increase efficiency; (ii) increasing personnel resources; and (iii) implementing changes that result in fewer FOIA requests being received by DIDP. Sager Decl. ¶ 27. These changes are discussed in greater detail below:

(a) In 2001, CDER implemented a new filing system for NDA documents known as the Division Files System ("DFS"), and DIDP integrated this filing system into its document retrieval function. The use of this system was expanded in September 2006 to include

abbreviated new drug application ("ANDA") documents.[18] DFS eliminates the paper document search for certain documents and instead allows electronic searches. This capability has reduced the time required to search for documents needed to process FOIA requests.

(b) In September 2003, DIDP began implementing organizational changes to increase the efficiency of its operations, including establishing a three-team structure and analyzing and adjusting work loads.

(c) DIDP sought and obtained funding for additional full-time positions, and began filling these positions in October 2003. This hiring effort has significantly increased DIDP staffing. DIDP had 18 full-time employees in 2002, 25 full-time employees in 2003, and currently has 28 full-time employees plus two full-time contractors. DIDP plans to hire approximately six more full-time employees in the near future. Unfortunately, however, the hiring of new employees generally does not immediately result in decreased processing times and decreased backlogs because, as a result of the extremely complex nature of the work, the frequently scientific and/or technical nature of the information being reviewed, and the analysis necessary to process document requests, the average employee requires one to two years to become fully productive. Contractors processing FOIA requests similarly require one to two years to become fully productive.

(d) DIDP's proactive posting on FDA's website of drug approval packages, approval letters, and warning letters reduces the number of incoming FOIA requests each year. The correlation between proactive posting of drug approval packages and the reduction of the number of incoming FOIA requests is difficult to quantify because DIDP cannot determine the number of

---

[18] An abbreviated new drug application is an application under 21 U.S.C. § 355(j) to market a generic version of a drug product.

requests "not received" as a result of this proactive disclosure work. However, DIDP has received on an annual basis over the last four years significantly fewer requests for drug approval packages as it has implemented work process changes resulting in more drug approval packages being posted to the FDA website and reducing the average time between approval and posting for NDAs for new molecular entities ("NME").[19] Following an internal work process analysis in 2003-2004, DIDP implemented procedures to prioritize the posting of NME approval packages, to reduce the backlog of non-NME approval packages for applications approved from 1998 through 2004, and to streamline the process for posting non-NME approval packages going forward. For calendar year 2005, the average review time for NME approval packages was eleven and a half weeks, and ranged from four to twenty-three weeks. For calendar year 2006, the average review time was eight and a half weeks, and ranged from five to twelve and a half weeks. For January 1, 2007, through September 27, 2007, the average review time was eight weeks, and ranged from five and three quarters to ten weeks. Over the last two years, the number of incoming requests received by DIDP on an annual basis for approval packages has decreased by approximately 200, which appears to be at least partially a result of DIDP's efforts to post approval packages more quickly.[20]

---

[19] A new molecular entity is an active ingredient in a drug product that has never before been approved for marketing in the United States in any form.

[20] Generally, the more time that lapses between the time a product is approved and the time its approval package is posted, the more FOIA requests DIDP receives for the approval documents. A multi-year gap between NDA approval and posting of the approval package to the agency's website was commonplace at DIDP until procedures were implemented to reduce the backlog of approval packages to be posted. For example, AndroGel (testosterone), NDA number 21-015, was approved on February 28, 2000. The approval package was not posted to the FDA website until January 15, 2004. DIDP had twenty-seven FOIA requests for the approval package pending in its queue at the time the approval package was posted. When DIDP posted the approval package, it notified the pending requesters, as per its usual practice. Over the last two (continued...)

(e) DIDP has engaged in customer education and outreach efforts to assist large volume requesters (i.e., requesters who submit significant numbers of FOIA requests each year) in targeting their requests more precisely so as to decrease the time it takes to respond to their requests. These efforts have, for example, resulted in one of DIDP's most frequent FOIA requesters significantly curtailing the number of requests it submits on an annual basis. In 2003, DIDP, as part of a workflow analysis, identified one company as one of the most prolific requesters. As a direct result of DIDP's outreach, the current number of requests submitted by that company on an annual basis is approximately 900 fewer than it was in 2003.

(f) In January 2006, FDA started using a single, agency-wide tracking system for FOIA requests, which, in the past, had been tracked using three separate systems. The new tracking system simplified the procedure for electronically archiving in an agency-wide system documents sent in response to FOIA requests. With the implementation of this new system, DIDP changed its work process by more quickly electronically archiving documents sent in response to FOIA requests. When DFOI receives a request for a copy of a FOIA request previously answered by DIDP (commonly referred to as a "fill-from" FOIA request), it will answer the new request directly if the records are available in the agency system, rather than routing it to DIDP for processing. This change has allowed DFOI to take on more responsibility for answering fill-from FOIA requests, thus allowing DIDP to spend more time working on Complex Track requests. This new process has resulted in DIDP receiving fewer fill-from FOIA requests, while the number of fill-from FOIA requests received by FDA overall has increased over this time-frame. DIDP received for processing 447 fill-from FOIA requests in 2005, but only 199 fill-from FOIA

[20](...continued)
years, no drug approval package had pending at the time of its posting more than eight requests for a copy of the approval package.

requests in 2006, and seven fill-from FOIA requests in 2007. This change in work process has contributed to the reduction in the number of incoming FOIA requests routed to DIDP, thereby freeing up resources to be used for processing pending requests. Id.

The steps taken by DIDP make clear that CDER takes its obligations under FOIA seriously and makes every effort to reduce its backlog of requests while coping with the enormous burdens upon the division. Indeed, despite the amount of the time required prior to new employees becoming fully productive, the organizational and work process changes, as well as DIDP's other efforts to increase efficiency, have had a measurable impact on DIDP's backlog. Sager Decl. ¶ 26. DIDP's backlog of pending FOIA requests has decreased from a high of 6,783 in August 2003, to a backlog of approximately 3,420 requests (as of January 31, 2008), which equates to a decrease of approximately fifty percent. Id.

## CONCLUSION

FDA takes its responsibilities in the administration of its FOIA program very seriously. For example, in fiscal year 2007, FDA spent 14 million dollars and 93 staff years (i.e., the equivalent of 93 full-time employees) responding to FOIA requests. Sadler Decl. ¶ 17. But the personnel resources of FDA components are insufficient to keep up with the large number of requests received, as well as the increased complexity of these requests. Id. For the foregoing reasons, Defendants' motion for a stay of proceedings for 18 months[21] should be granted, and Plaintiff's Motion for Judgment on the Pleadings denied.[22]

---

[21] See Sager Decl. ¶¶ 30-38 (explaining the steps necessary to process Plaintiff's request and the estimated time needed to complete that processing).

[22] Three district courts, in the Second and Third Circuits, have recently denied FDA Open America stays. See Jerome Stevens Pharms. v. FDA, No. 07-01985-(ADS) (AKT) (E.D.N.Y. Jan. 12, 2008); Weinberg v. von Eschenbach, No. 07-1819 (FSH) (D. N.J. Oct. 10,
(continued...)

Respectfully submitted,

/s/ Jeffrey A. Taylor /dvh

______________________

JEFFREY A. TAYLOR, D.C. BAR #498610
United States Attorney

/s/ Rudolph Contreras

______________________

RUDOLPH CONTRERAS, D.C. BAR #434122
Assistant United States Attorney

/s/ Beverly M. Russell

______________________

BEVERLY M. RUSSELL, D.C. BAR #454257
Assistant United States Attorney
U.S. Attorney's Office for the District of Columbia,
Civil Division
555 4th Street, N.W., Rm. E-4915
Washington, D.C. 20530
Ph: (202) 307-0492
Fax: (202) 514-8780
E-mail: beverly.russell@usdoj.gov

Of Counsel:

JAMES C. STANSEL
Acting General Counsel

GERALD F. MASOUDI
Associate General Counsel
Food and Drug Division

ERIC M. BLUMBERG
Deputy Chief Counsel, Litigation

---

[22](...continued)
2007); Bloomberg L.P. v. FDA, No. 06-6552 (VM) (S.D.N.Y. Aug. 15, 2007). The government notes that these opinions are not binding on this Court; nevertheless, the government has included information in this motion and the attached Sager declaration that addresses those courts' concerns.

SHOSHANA HUTCHINSON
Associate Chief Counsel, Litigation
U.S. Dept. of Health & Human Services
Office of the General Counsel
5600 Fishers Lane
Rockville, MD 20857
301-827-8579

## CERTIFICATE OF SERVICE

I certify that the foregoing ***Defendants' Motion for an Open America Stay and Opposition to Plaintiff's Motion for Judgment on the Pleadings*** was served upon Plaintiff by the Court's Electronic Case Filing System to:

Richard E. Condit
Government Accountability Project
1612 K Street, N.W., Suite 1100
Washington, D.C. 20006
richardc@whistleblower.org

on this 19th day of February, 2008.

/s/ Beverly M. Russell

BEVERLY M. RUSSELL
Assistant United States Attorney

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| GOVERNMENT ACCOUNTABILITY PROJECT,<br><br>Plaintiff,<br><br>v.<br><br>U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES; U.S. FOOD AND DRUG ADMINISTRATION,<br><br>Defendants. | ) | Civil Action No. 07-01702 (CKK) |

**DECLARATION OF NANCY B. SAGER**

I, Nancy B. Sager, declare as follows:

1. I am the Director of the Division of Information Disclosure Policy ("DIDP"), Center for Drug Evaluation and Research ("CDER"), United States Food and Drug Administration ("FDA"), in Rockville, Maryland. I submit this declaration in support of the government's request for a stay of proceedings pursuant to 5 U.S.C. § 552(a)(6)(C).

2. I have supervisory authority over DIDP, which processes and responds to requests for documents in the possession of CDER made pursuant to the Freedom of Information Act ("FOIA"). DIDP is also responsible for proactively reviewing, redacting, and posting on FDA's website, consistent with Executive Order ("E.O.") 13,392, documents anticipated to be frequently requested, such as drug approval packages and warning letters. In addition, DIDP responds to requests for documents made by the U.S. Congress, foreign, state, and local governments, and other federal agencies, and to third-party subpoenas and court orders for CDER documents.

3. At my direction, FDA personnel search records systems for documents under CDER's

control to identify records and other information that may be responsive to particular requests. DIDP staff gather and review potentially responsive documents to determine whether, before being made available for public disclosure, they should be redacted in part or in their entirety, under any applicable FOIA exemption, other statutory provision, or, in the context of third-party subpoenas, any applicable privilege. DIDP also reviews and, in certain circumstances, redacts non-disclosable information from documents that respond to Congressional document requests.

4. The statements made in this declaration are based upon my personal knowledge, information made known to me in my official capacity, and information available to me in my official capacity and about which I have become knowledgeable.

5. The purpose of this declaration is to: (a) describe DIDP's processing of FOIA and other document requests; (b) give an account of DIDP's current workload for all requests for information, including related litigation; (c) explain the current backlog of FOIA requests and the efforts to reduce that backlog and process all requests; (d) describe the events to date with respect to plaintiff's FOIA request; and (e) describe the steps that will be required to respond to plaintiff's request for documents.

PROCESSING OF FOIA REQUESTS BY DIDP

6. DIDP consists of twenty-eight people: a Director, one Special Assistant, three team leaders, eleven regulatory counsels, four consumer safety officers, five paralegals, and three project specialists. In addition, CDER DIDP currently employs two full-time contractors who assist in producing documents in litigation matters, reviewing documents, and processing FOIA requests.

7. Initially, all FOIA requests for FDA documents are received by FDA's main Freedom of Information office, the Division of Freedom of Information ("DFOI"), Office of Management

Programs. DFOI logs in each request, assigns it a reference number, and routes it to the agency component(s) most likely to have records relevant to the request. CDER is the center within FDA that is responsible for the regulation of most human drugs and therapeutic biological products. FOIA requests referred to CDER are sent to DIDP.

8. CDER considers FOIA requests that can be answered quickly with readily available documents, and that require no further searching or redacting, to be "simple" requests, which generally are processed on a fast track (the "Simple Track"). Other requests are considered "complex" requests, which follow a slower processing track (the "Complex Track"). DIDP staff generally process requests within the Simple and Complex Tracks on a first-in, first-out basis.

9. Simple requests do not require DIDP personnel to redact documents, generally because DIDP has already reviewed and redacted the responsive documents, the documents requested are publicly available, or it is apparent from the face of the request that the documents do not exist in CDER's records.[1] If some portion of a request is clearly simple and the rest of it is complex, the simple portion may be segregated into the Simple Track, and the complex portion assigned to the Complex Track.

10. DIDP's response to a request in the Simple Track principally involves making copies of previously processed documents and providing them to the requester, directing the requester to publicly available documents, or providing the requester with a statement that CDER does not have documents responsive to the request.

11. Any requests that are not considered simple are placed in the Complex Track.

---

[1] Documents may fall into this category because, for example, they have been assembled and redacted in response to a prior FOIA request or because the request involves a drug approval package that DIDP has already finished processing in preparation for its posting on FDA's website.

Generally, as requests move toward the head of the Complex Track, they are assigned to a specific DIDP employee for processing. However, if DIDP anticipates that a FOIA request in the Complex Track will require extensive searches for numerous documents in different locations, then multiple individuals in DIDP are assigned to the request. Complex requests that require this level of staffing often involve voluminous records and frequently necessitate extensive time for searching and redaction in order to prepare the records for release. Furthermore, such requests often require substantive input from supervisory staff to determine both the scope of the search and the ultimate releasability of the records. To promote efficiency in its operations, DIDP has developed a system whereby once a request for certain records comes to the top of the Complex Track, requests (or portion(s) of requests) seeking the same, or closely related, records are processed at the same time. This means that some requesters whose requests are further back in the queue may initially receive only a partial response to their requests, but it permits DIDP to more effectively use its limited resources to provide at least some documents to those requesters earlier than they might otherwise have received them.

12. For requests in the Complex Track, DIDP may need to search, or contact individuals and direct them to search, numerous agency files. After the search has been carried out and the documents have been sent to DIDP, DIDP conducts a preliminary review of the records collected to verify that they are responsive to the request. DIDP then conducts a page-by-page, line-by-line review of the responsive documents to determine whether any records can be released and whether any FOIA exemptions apply. Any exempt material is redacted. Frequently, a team leader conducts a quality control review to ensure that the responsive documents have been properly prepared for public disclosure. This review ensures that the FOIA exemptions have been properly applied and that no material meriting protection will be released.

Finally, copies of the responsive documents, as redacted, are prepared and delivered to the requester.

13. If the documents are being prepared in response to a complex request that is the subject of litigation (such as plaintiff's request), all responsive documents are bates-stamped before the review and redaction process begins. After the review and redaction process is completed, DIDP staff prepare a Vaughn index explaining what has been redacted or withheld from disclosure.

14. It is not always efficient to complete one request before moving on to the next. DIDP personnel therefore often work on more than one request at a time. Processing of a complex request may be delayed for a variety of reasons, such as resolving which exemptions apply, locating missing records, or consulting with other government agencies about the propriety of releasing certain documents. In the interest of efficiency during this waiting period, the next request in the track may be processed and, if work on it is completed, the responsive records will be released at that time. Therefore, large requests often proceed alongside smaller requests in the Complex Track to reduce the processing time for many FOIA requests, and to make the most of DIDP's time and resources.

## DIDP'S WORKLOAD

15. FDA regulates more than $1 trillion of commerce each year. Its jurisdiction includes drugs, foods, animal feeds, biologics, veterinary medicines, and medical devices. A byproduct of the wide scope of the agency's activities is a massive volume of FOIA requests.

16. In 2007, approximately twenty-five percent of all FOIA requests for FDA documents were directed to DIDP. DIDP received 5,310 requests in 2003; 5,156 requests in 2004; 4,050 requests in 2005; 3,335 requests in 2006; and 2,888 requests in 2007. As described in paragraph

27 below, efforts by DIDP to proactively review, redact, and post documents on the agency's web site, as well as to improve its work process, have played a significant role in the reduction over the last four years in the number of requests received on an annual basis.

17. In 2006, DIDP received an average of 285 FOIA requests per month, and in 2007, DIDP received an average of 240 requests per month. However, this figure is somewhat misleading because it does not reflect the size and complexity of the requests received, or DIDP's backlog. For example, a FOIA request submitted on May 20, 2005, and assigned reference number 05-7022, sought documents concerning the drug Serc (betahistine). The request reached the top of the Complex Track in November 2007. DIDP identified approximately 21,000 pages of responsive documents, including: the Investigational New Drug Application ("INDA"),[2] the New Drug Application ("NDA"),[3] and approval documents for the NDA; correspondence pertaining to FDA's review and approval of the drug; and other correspondence between FDA and the manufacturer. DIDP estimated at that time that processing the request would require one full-time employee approximately twenty-seven weeks to review those documents and redact exempt information.

18. The number of FOIA requests received per month in 2007 is also deceptively low

---

[2] An INDA is a request by a sponsor or investigator that it be permitted, pursuant to 21 U.S.C. § 355(i), to ship an unapproved drug in interstate commerce for investigational use. The main purposes of an IND are to provide sufficient information to FDA to assure the safety and rights of the human subjects in the clinical investigations, and to help assure that the quality of those investigations is adequate to permit an evaluation of the safety and effectiveness of the drug product .

[3] An NDA is the means by which drug sponsors formally request, pursuant to 21 U.S.C. § 355(b), FDA approval under to market a new drug in the U.S. It includes substantial and detailed information about the safety and effectiveness of the product for its proposed indication(s).

because many of the FOIA requests that DIDP receives actually contain multiple individual requests for documents. For example, a FOIA request submitted on July 30, 2007, and assigned reference number 07-6874, sought 992 individual MedWatch forms.[4] DIDP estimates that the request will require one full-time employee approximately four weeks to review those documents and redact exempt information. This is due in part to the fact that MedWatch forms are frequently handwritten (and thus difficult to read), and that they contain a large amount of sensitive personal privacy information that is redacted prior to disclosure. Although DIDP (like FDA as a whole) does not count in its total FOIA numbers each of the multiple requests that may be encompassed within a single FOIA request, it is not unusual for a request to contain as many as five, ten, or more separate requests for documents. For example, out of the 181 requests received by DIDP in November 2007, 7 contained 15 or more requests, 5 contained 10-14 requests, 23 contained 5-9 requests, and 30 contained 2-4 requests.

19. Because CDER is the agency component responsible for the regulation of most human drugs and therapeutic biological products, many of the types of records within CDER involve information regarding the drug approval process, such as: (a) manufacturing, testing, packaging, and labeling information; (b) documents prepared by FDA relating to the decision whether or not to approve an application seeking marketing approval; and (c) patient information relating to clinical studies. Due to the nature of this type of regulatory work, the vast majority of CDER documents that are responsive to FOIA requests include information that is exempt from disclosure as trade secret information, confidential commercial information, personal privacy

---

[4] MedWatch forms (Form FDA 3500) are used by healthcare professionals, consumers, and patients for reporting to FDA serious adverse events, potential and actual product use errors, and product quality problems associated with the use of FDA-regulated products.

information, and/or deliberative process information.

20. DIDP processed approximately 4,340 requests in 2003; 6,800 requests in 2004; 4,876 requests in 2005; 3,907 requests in 2006; and 3,498 requests in 2007. Despite this rate of processing, DIDP has a backlog of approximately 3,420 FOIA requests as of January 31, 2008. The efforts undertaken by DIDP to reduce this backlog are discussed in paragraph 27 below.

21. During 2007, DIDP collected, reviewed, redacted, and indexed tens of thousands of pages of documents related to multiple FOIA lawsuits, third-party subpoenas (involving cases in which FDA is not a party), and discovery requests in litigation matters in which FDA is a party. Although many of these document productions were in response to matters that had been pending for some time, the actual document productions were handled by DIDP in 2007. These productions have required a substantial time commitment by DIDP personnel, such that DIDP has committed five full-time employees to respond solely to these matters. These five employees are responsible for the collection, organization, review, redaction, and indexing of documents for these matters. Some examples of these document productions are:

(a) In Securities and Exchange Commission v. Richard F. Selden, Case No. 05-cv-00476 (D.D.C.), a third-party subpoena was served on FDA on or about October 28, 2005. The subpoena required production of documents concerning Replagal (an unapproved biologic), Transkaryotic Therapies, Inc. (the former manufacturer of Replagal), Richard Selden (the former CEO of Transkaryotic Therapies, Inc.), and Fabrazyme (an approved biologic). DIDP reviewed, redacted, and indexed approximately 12,000 pages of documents for this production.

(b) In In Re: POZEN, Inc. Securities Litigation; Case No. 1:04-cv-00505-WLO (M.D.N.C.), a third-party subpoena was served on FDA on or about August 23, 2006. The subpoena required production of documents concerning two NDAs held by Pozen, Inc. DIDP

reviewed and redacted approximately 2,600 pages of documents for this production.

(c) In In Re: Forest Laboratories, Inc. Securities Litigation; Case No. 05-cv-2827 (S.D.N.Y.), a third-party subpoena was served on FDA on or about October 3, 2006. The subpoena required production of documents concerning the Celexa and Lexapro NDAs. DIDP reviewed and redacted approximately 500 pages of documents for this production.

(d) In In Re: Ortho Evra Product Liability Litigation; MDL Docket No. 1742 (N.D. Ohio), a third-party subpoena was served on FDA on or about December 8, 2006. The subpoena required production of documents concerning the Ortho Evra NDA. DIDP reviewed, redacted, and indexed approximately 5,000 pages of documents for this production.

(e) In In Re: Fosamax Product Liability Litigation; MDL Docket No. 1742 (S.D.N.Y.), a third-party subpoena was served on FDA on or about February 5, 2007. The subpoena required production of documents concerning the Fosamax NDA. DIDP reviewed, redacted, and indexed approximately 1,300 pages of documents for this production.

(f) In In Re: Seroquel Product Liability Litigation; MDL Docket No. 6:06-md-1769 (M.D. Fla.), a third-party subpoena was served on FDA on or about May 10, 2007. The subpoena required production of documents concerning the Seroquel NDA. DIDP reviewed, redacted, and indexed approximately 3,000 pages of documents for this production.

(g) In Jerome Stevens Pharmaceuticals, Inc. v. Food and Drug Administration; Case No. 1:02-cv-01939 (D.D.C.), a lawsuit filed under the Federal Tort Claims Act, DIDP reviewed, redacted, and indexed approximately 3,000 pages of documents to respond to discovery requests.

(h) In Bloomberg L.P. v. Food and Drug Administration; Case No. 06-cv-6552 (S.D.N.Y.), a FOIA lawsuit, DIDP reviewed, redacted, and indexed approximately 5,000 pages of documents.

22. Another huge part of DIDP's workload recently has been a significant and unanticipated increase since 2004 in the resources it devotes to document requests made by Congress. Although these requests are not made under FOIA and are not processed in the FOIA tracks, the same group of employees processes them because of the nature of the work and the need for consistency. These requests are also prioritized because they originate from the legislative branch. Between August 2004 and August 2005, DIDP dedicated one full-time employee (with additional help from other DIDP employees as warranted) to responding to such document requests. During that period, DIDP produced for Congress over 100,000 pages relating to matters including selective serotonin reuptake inhibitors (commonly referred to as "SSRIs"), COX-2 inhibitor drugs, and the participation by the elderly in clinical drug trials. Between May and July 2006 alone, DIDP reviewed over 125,000 pages for production in response to a Congressional subpoena relating to the drug Ketek. This production required the full-time attention of no less than two, and sometimes as many as six, DIDP employees, during that three-month period; because some of these DIDP employees were pulled from other tasks to work on this production, the additional staffing for the Ketek production necessitated a corresponding decrease in staff time devoted to responding to FOIA requests. As further described below, in the past twelve months, Congressional productions have continued to require a substantial time commitment by DIDP personnel:

(a) For a Congressional request for documents regarding the cardiovascular safety of Avandia, DIDP reviewed approximately 24,000 pages of documents;

(b) For a Congressional request for documents regarding FDA's approval and oversight of one approved drug, DIDP reviewed approximately 5,000 pages of documents;

(c) For a Congressional request for documents regarding drugs approved under Subpart

H of FDA's regulations, DIDP reviewed approximately 10,000 pages of documents; and

(d) For a Congressional request for documents regarding Erythropoiesis-Stimulating Agents, DIDP reviewed approximately 5,000 pages of documents.

23. In addition to the foregoing, DIDP, in light of its responsibilities under the Electronic Freedom of Information Act Amendments of 1996 ("EFOIA")[5] and consistent with E.O. 13,392,[6] proactively reviews, redacts, and posts on FDA's website certain drug approval packages,[7] approval letters,[8] and warning letters.[9] DIDP proactively reviewed, redacted, and posted on FDA's website 1,003 approval letters, 107 approval packages, and 35 warning letters in 2004; 806 approval letters, 76 approval packages, and 41 warning letters in 2005; 1,108 approval letters, 99 approval packages, and 35 warning letters in 2006; and 1,115 approval letters, 92 approval packages, and 51 warning letters in 2007. Through this process of proactive review and

---

[5] EFOIA Amend. of 1996, Pub. L. No. 104-231; § 7(c), 110 Stat. 3048 (codified as amended at 5 U.S.C. § 552(a)(6)(C)(ii)).

[6] On December 14, 2005, the President issued E.O. 13,392, entitled Improving Agency Disclosure of Information. E.O. 13,392 encourages federal agencies to increase the dissemination of records to the public without the need for a FOIA request.

[7] A drug approval package is a compilation of (i) FDA-generated documents related to the agency's review of an application to market a new drug or biological product (i.e., an NDA or a "biologics license application" (BLA)), from the time the applicant submits the application to time of FDA's decision regarding whether to approve the application; (ii) certain correspondence and administrative documents pertinent to the application; and (iii) final approved labeling. Because of the nature of the information frequently included in such documents (e.g., manufacturing and patient information), drug approval packages usually contain information that, even after approval of the product at issue, remains exempt from disclosure under the FOIA and is redacted prior to posting.

[8] An approval letter is an official communication from FDA to the sponsor of an NDA or BLA that allows the commercial marketing of the product.

[9] A warning letter is a written communication from FDA to a regulated entity notifying it of violations of the statutes and/or regulations that FDA enforces.

posting, DIDP makes available tens of thousands of pages of documents each year regarding newly approved drugs, without regard for whether there is a FOIA request pending for those documents. This means that individuals seeking these documents do not need to file a FOIA request to obtain them. However, DIDP spends the same amount of time reviewing and redacting these documents as it would if it had been responding to a FOIA request. Thus, although the number of FOIA requests decreases because of the proactive posting, there is not an equivalent decrease in DIDP's workload.

24. On September 27, 2007, the President signed into law the Food and Drug Administration Amendments Act of 2007 ("FDAAA"). Among other provisions, FDAAA gave FDA new authority and obligations regarding the new drug and biologic review process and the monitoring of drug safety after products are being marketed. FDAAA also reauthorized key programs pertaining to the testing and approval of drug and biological products in children. All of these provisions of FDAAA have resulted in new or increased obligations for DIDP, some of which must be immediately implemented, and some of which must be implemented over the next six months. Over the past few months, six DIDP employees have been working on various projects related to the new disclosure requirements being implemented as part of FDAAA. This has resulted in fewer personnel resources available to process FOIA requests. Some of the new disclosure obligations required by FDAAA and affecting DIDP are:

(a) FDAAA provided authority to FDA to require sponsors of NDAs to develop Risk Evaluation and Mitigation Strategies ("REMS") and established standards and procedures for requiring REMS and enforcing the requirements. It also included certain disclosure requirements and timeframes related to REMS and the drug approval process. DIDP has the responsibility for ensuring that the relevant documents are reviewed, redacted, and posted in compliance with the

statutory timeframes.

(b) FDAAA codified the establishment of CDER's Drug Safety Oversight Board ("DSB") and provided that certain disputes over REMS will be reviewed by the DSB. FDAAA requires that FDA proactively: (i) publish on the FDA website notices of disputes within five business days of scheduling of the dispute for DSB review; (ii) review, redact, and publish transcripts of the DSB meetings within ninety days; and (iii) review, redact, and publish DSB recommendations regarding the REMS disputes within five days. DIDP has the responsibility for reviewing, redacting, and posting the relevant documents on the agency's website in compliance with the statutory provisions.

(c) FDAAA reauthorized and amended the Best Pharmaceuticals for Children Act ("BPCA"), under which drug sponsors can obtain additional marketing exclusivity by conducting FDA-requested pediatric studies contained in a written request. The statute requires that FDA post on its website: (i) notices of exclusivity determinations with a copy of the written request within thirty days of a determination; and (ii) review of pediatric studies within 210 days from the submission of a report. Because the BPCA provisions pertain solely to products regulated by CDER, DIDP has the responsibility for reviewing, redacting, and posting on the agency's website the relevant documents in compliance with these provisions.

(d) FDAAA reauthorized and amended the Pediatric Research Equity Act ("PREA"), which requires that most applications for drugs and biological products include an assessment of the product in children, unless the requirements are waived or deferred. The statutory provisions require that study reports, study information, and certain submissions be made publicly available within certain set timeframes. DIDP has the responsibility for reviewing, redacting, and posting the relevant CDER documents in compliance with the statutory provisions.

25. In summary, DIDP's current workload includes: a stream of new FOIA requests at the rate of approximately 240 per month; a backlog of approximately 3,420 FOIA requests (as of January 31, 2008); document productions for FOIA lawsuits; responding to subpoenas; proactive postings as part of the agency's compliance with EFOIA and E.O. 13,392; responding to requests for documents made by Congress, foreign, state and local governments, and other federal agencies; and implementing the disclosure provisions of FDAAA affecting CDER. This workload has resulted in substantial processing delays.

DIDP BACKLOG AND RESPONSIVE ACTION

26. Because of the extraordinary demands on its resources, DIDP was unable to respond to plaintiff's FOIA request within the statutory time limit. DIDP recognizes the importance of processing its requests and complying with the deadlines set forth under the FOIA. Regrettably, despite DIDP's commitment of resources and personnel, compliance with these deadlines is often not possible. DIDP has implemented organizational changes, work process changes, and taken other steps to increase the efficiency of its operations and help it reduce its FOIA backlog. These changes and efforts have had a measurable impact on DIDP's backlog. DIDP's backlog of pending FOIA requests has decreased from an August 2003 high of 6,783, to a backlog of approximately 3,420 requests (as of January 31, 2008). This equates to a decrease of approximately fifty percent.

27. There are three primary types of organizational and work process changes that have helped DIDP reduced its backlog: (i) using new information technology systems to increase efficiency; (ii) increasing personnel resources; and (iii) implementing changes that result in fewer FOIA requests being received by DIDP. These changes are discussed in greater detail below:

(a) In 2001, CDER implemented a new filing system for NDA documents known as the

Division Files System ("DFS"), and DIDP integrated this filing system into its document retrieval function. The use of this system was expanded in September 2006 to include abbreviated new drug application ("ANDA") documents.[10] DFS eliminates the paper document search for certain documents and instead allows electronic searches. This capability has reduced the time required to search for documents needed to process FOIA requests.

(b) In September 2003, DIDP started to implement organizational changes to increase the efficiency of its operations, including establishing a three-team structure and analyzing and adjusting work loads.

(c) DIDP sought and obtained funding for additional full-time positions, and began filling these positions in October 2003. This hiring effort has significantly increased DIDP staffing. DIDP had 18 full-time employees in 2002, 25 full-time employees in 2003, and currently has 28 full-time employees plus two full-time contractors. DIDP plans to hire approximately six more full-time employees in the near future. Unfortunately, however, the hiring of new employees generally does not immediately result in decreased processing times and decreased backlogs because, as a result of the extremely complex nature of the work, the frequently scientific and/or technical nature of the information being reviewed, and the analysis necessary to process document requests, the average employee requires one to two years to become fully productive. Contractors processing FOIA requests similarly require one to two years to become fully productive.

(d) DIDP's proactive posting on FDA's website of drug approval packages, approval letters, and warning letters reduces the number of incoming FOIA requests each year. The

---

[10] An abbreviated new drug application is an application under 21 U.S.C. § 355(j) to market a generic version of a drug product.

correlation between proactive posting of drug approval packages and the reduction of the number of incoming FOIA requests is difficult to quantify because DIDP cannot determine the number of requests "not received" as a result of this proactive disclosure work. However, DIDP has received on an annual basis over the last four years significantly fewer requests for drug approval packages as it has implemented work process changes resulting in more drug approval packages being posted to the FDA website and reducing the average time between approval and posting for NDAs for new molecular entities ("NME").[11] Following an internal work process analysis in the 2003-2004 time frame, DIDP implemented procedures to prioritize the posting of NME approval packages, to reduce the backlog of non-NME approval packages for applications approved from 1998 through 2004, and to streamline the process for posting non-NME approval packages going forward. For calendar year 2005, the average review time for NME approval packages was 11 ½ weeks, and ranged from 4 to 23 weeks. For calendar year 2006, the average review time was 8 ½ weeks, and ranged from 5 to 12 ½ weeks. For January 1, 2007, through September 27, 2007, the average review time was 8 weeks, and ranged from 5¾ to 10 weeks. Over the last two years, the number of incoming requests received by DIDP on an annual basis for approval packages has decreased by approximately 200, which appears to be at least partially a result of DIDP's efforts to post approval packages more quickly.[12]

---

[11] A new molecular entity is an active ingredient in a drug product that has never before been approved for marketing in the United States in any form.

[12] Generally, the more time that lapses between the time a product is approved and the time its approval package is posted, the more FOIA requests CDER receives for the approval documents. A multi-year gap between NDA approval and posting of the approval package to the agency's website was commonplace at DIDP until procedures were implemented to reduce the backlog of approval packages to be posted. For example, AndroGel (testosterone), NDA number 21-015, was approved on February 28, 2000. The approval package was not posted to the FDA website until January 15, 2004. DIDP had twenty-seven FOIA requests for the approval package

(e) DIDP has engaged in customer education and outreach efforts to assist large volume requesters (i.e., requesters who submit significant numbers of FOIA requests each year) in targeting their requests more precisely so as to decrease the time it takes to respond to their requests. These efforts have, for example, resulted in one of DIDP's most frequent FOIA requesters significantly curtailing the number of requests it submits on an annual basis. In 2003, DIDP, as part of a workflow analysis, identified one company as one of the most prolific requesters. As a direct result of DIDP's outreach, the current number of requests submitted by that company on an annual basis is approximately 900 fewer than it was in 2003.

(f) In January 2006, FDA started using a single, agency-wide tracking system for FOIA requests, which, in the past, had been tracked using three separate systems. The new tracking system simplified the procedure for electronically archiving in an agency system documents sent in response to FOIA requests. With the implementation of this new system, DIDP changed its work process by more quickly electronically archiving documents sent in response to FOIA requests. When DFOI receives a request for a copy of a FOIA request previously answered (commonly referred to as a "fill-from" FOIA request), it will answer the new request directly if the records are available in the agency system, rather than routing it to DIDP for processing. This change has allowed DFOI to take on more responsibility for answering fill-from FOIA requests, thus allowing DIDP to spend more time working on Complex Track requests. This new process has resulted in DIDP receiving fewer fill-from FOIA requests, while the number of fill-from FOIA requests received by FDA overall has increased over this time-frame. DIDP

---

pending in its queue at the time the approval package was posted. When DIDP posted the approval package, it notified the pending requesters, as per its usual practice. Over the last two years, no drug approval package had pending at the time of its posting more than eight requests for a copy of the approval package.

received for processing 447 fill-from FOIA requests in 2005, but only 199 fill-from FOIA requests in 2006, and 7 fill-from FOIA requests in 2007. This change in work process has contributed to the reduction of the number of incoming FOIA requests routed to DIDP, and thus permitted resources to be used for processing pending requests.

PLAINTIFF'S REQUEST

28. On June 29, 2007, DIDP received from DFOI a FOIA request from the Government Accountability Project (plaintiff), dated June 27, 2007. DFOI assigned this FOIA request reference number 2007-6023. This request seeks the following two categories of documents relating to the drug ciprofloxacin: (i) in electronic form, with description of program to read: All goniometry (joint angle motion measurement) data, including but not limited to, all passive range of motion of joints, by protocol, measured in degrees, recorded from all subjects and sorted by site or investigator number, subject or numeric identification number, the joints measured, the dates of measurement and information on the age of the subject at enrollment or first measurement in months or years, or birth month and year, pertaining to domestic and foreign clinical trial studies 1001169 and 100201; and (ii) in paper form: all FDA Division of Scientific Investigations ("DSI") reports and records, domestic and outside of US, concerning all DSI inspections pertaining to clinical trial studies 1001169 and 100201.

29. DIDP determined that this request did not meet the criteria for the Simple Track (because it requested documents that were not readily available and that would require a search and possible redaction) and therefore assigned it to the Complex Track. Although DIDP expects that its ongoing process improvement activities, work process changes, and current hiring initiatives, as discussed in paragraph 27 above, will continue to help it reduce its FOIA backlog, DIDP nevertheless will require additional time to process plaintiff's request. DIDP estimates

that this request will move to the head of the Complex Track approximately 16 months from the date of this Declaration. This estimate is based on DIDP's current backlog and current processing time for requests seeking this type of information. DIDP does not anticipate that this request will be answered earlier by virtue of responding to similar requests, because DIDP is not aware of older requests seeking records closely related to plaintiff's request.

## STEPS REQUIRED TO PROCESS PLAINTIFF'S REQUEST

30. It is impossible for DIDP to estimate precisely at this time the volume of responsive documents likely to be identified during the searches for this request, given that it has not yet risen to the top of the Complex Track (and thus, DIDP has not yet done any work to process the request). Similarly, the amount of time needed by DIDP to complete its review and redaction will vary depending on the total number of responsive pages located. However, in light of DIDP's experience with requests seeking similar types of information, DIDP estimates that it will require approximately two months to process plaintiff's FOIA request once it rises to the head of the Complex Track.

31. Once DIDP has assembled all of the potentially responsive documents and electronic files, it will review them to determine whether they are, in fact, responsive.

32. After all of the responsive documents and electronic files have been identified, DIDP will follow its standard procedure for complex requests that are in litigation, including: bates-stamping the documents; a page-by-page, line-by-line review of the documents for applicable exemptions; redaction of exempt materials; quality control review; indexing; and copying.

33. Documents responsive to plaintiff's request will likely contain information that is exempt from disclosure under FOIA. Some of the exemptions that are likely to be applicable to

the responsive documents and electronic files are listed in paragraphs 34 through 36 below, along with examples of types of documents that might be anticipated to be responsive to plaintiff's request.

34. Exemption 4 of the FOIA protects from disclosure "trade secrets and commercial or financial information obtained from a person [that is] privileged or confidential." 5 U.S.C. § 552(b)(4). Moreover, the Trade Secrets Act prohibits the release of trade secret and confidential commercial information unless otherwise authorized by law. 18 U.S.C. § 1905. The Federal Food, Drug, and Cosmetic Act ("FD&C Act") also prohibits the release of trade secret information to persons other than Department of Health and Human Services employees, to Congress, or to the courts in cases brought under the FD&C Act. 21 U.S.C. § 331(j). Additionally, FDA regulations provide that trade secrets and commercial information that is privileged or confidential are not available for public disclosure. 21 C.F.R. § 20.61. Clinical study reports containing raw clinical and pre-clinical safety and efficacy data are an example of anticipated responsive documents likely to contain commercial information that is privileged or confidential.

35. Exemption 5 of the FOIA permits the government to withhold information that is exempt from disclosure under the deliberative process privilege, which protects internal pre-decisional communications that are part of a government agency's decision-making process. 5 U.S.C. § 552(b)(5); see also 21 C.F.R. § 20.62. FDA intra-agency memoranda and e-mails regarding regulatory plans for the inspection of clinical investigators and clinical trial sites, as well as potential options resulting from such inspections, are examples of anticipated responsive documents likely to contain this protected type of information.

36. Exemption 6 of the FOIA permits the government to withhold all information about individuals in "personnel and medical files and similar files" when the disclosure of such information "would constitute a clearly unwarranted invasion of personal privacy." 5 U.S.C. § 552(b)(6). Similarly, FDA regulations also provide that FDA will withhold information that would identify patients or research subjects in any medical or similar report, test, study, or other research project. 21 C.F.R. § 20.63. Clinical study reports containing patient records and information are an example of anticipated responsive documents likely to contain this protected type of information.

37. After all of the potentially responsive documents for plaintiff's FOIA request have been located, bates-stamped, reviewed, redacted, and indexed, as set forth above, copies of all disclosable information will be made available to plaintiff.

38. Consistent with DIDP's practice of processing requests on a first-in and first-out basis, DIDP estimates that it will be able to produce the documents requested by plaintiff in 18 months from the date of this declaration, based on the estimate of plaintiff's request rising to the top of the Complex Track in 16 months and DIDP then taking two months to process the request.

Pursuant to 28 U.S.C. § 1746, I declare under the penalty of perjury that the foregoing is true and correct.

Nancy B. Sager

NANCY B. SAGER
Director, Division of Information
Disclosure Policy
Center for Drug Evaluation and Research
Food and Drug Administration
U.S. Department of Health and Human Services

Executed on February 15th, 2008, in Silver Spring, Maryland.

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| GOVERNMENT ACCOUNTABILITY PROJECT, Plaintiff, | ) | |
| v. | ) | Civil Action No. 07-01702 (CKK) |
| U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES; U.S. FOOD AND DRUG ADMINISTRATION, Defendants. | ) | |

**DECLARATION OF FREDERICK J. SADLER**

I, Frederick J. Sadler, declare as follows:

1. I am the Director of the Division of Freedom of Information ("DFOI"), Office of Management Programs, United States Food and Drug Administration ("FDA"), located in Rockville, Maryland. I have held this position since March 2007. I previously served as the Denials and Appeals Officer in the DFOI Office from July 2000 to December 2006. From December 2006 until March 2007, I served as the Acting Director of DFOI.

2. In my capacity as Director of DFOI, my duties and responsibilities include supervising the office the receives and processes requests for FDA records under the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552.

3. The statements made in this declaration are based upon my personal knowledge, information made known to me in my official capacity, and information available to me in my official capacity and about which I have become knowledgeable.

4. I submit this declaration in support of the government's motion for a stay of

proceedings in the above-captioned matter. The purpose of this declaration is to set forth DFOI's response to the FOIA request that is the subject of the Complaint in this case.

5. FDA received 11,400 requests in calendar year 2007 and 18,865 FOIA requests in 2006.

## REQUEST PROCESSING BY DFOI

6. FDA has created an electronic tracking system, the Agency Information Management Systems ("AIMS"), to store and track requests for documents submitted pursuant to FOIA. The AIMS tracking system debuted in January 2006. As of January 2006, when a FOIA request is received by DFOI, an FOI technician on my staff scans the request into a PDF format, logs and uploads the request into AIMS, and assigns the request a reference number. The reference number is four digits reflecting the calendar year in which the request was received (i.e., 2005, 2006, 2007) followed by a number reflecting the number of FOIA requests received by DFOI to date during that particular calendar year.

7. Because of FDA's size and the vast number of documents generated in the course of agency business, FDA has created a decentralized FOI function. Accordingly, after the FOI technician receives, scans, and logs an incoming request, he or she directs AIMS to forward, or "route," the request to the FDA office(s) most likely to possess responsive records ("the action office(s)"). The routing of a particular request through AIMS to the appropriate action office(s) takes place immediately following receipt and logging. I am available to consult with the FOI technicians in the event that the routing of a particular request is not clear from the text of the request.

8. Prior to January 2006, FOIA requests were stored and tracked using an electronic

system called Office of the Commissioner Applications ("OC APPS"). When FDA switched from OC APPS to AIMS in 2006, all FOIA records from approximately 1992 forward were uploaded into the AIMS system. The OC APPS system was similar to AIMS, except that under the OC APPS system, requests were not scanned into a PDF format, uploaded electronically, and then distributed electronically to the appropriate action office(s). Rather, under the OC APPS system, an FOI technician would receive a request, log it into the OC APPS system, assign it a reference number, route the request to the appropriate action office(s), and send a hard copy of the request by messenger to the action office(s). Hard copies were routinely received by the action office(s) within one business day.

9. Under the AIMS system, once a FOIA request is logged in, the AIMS systems automatically sends a letter to the requestor acknowledging FDA's receipt of the request ("the acknowledgment letter"). The acknowledgment letter is sent by U.S. mail and leaves DFOI's office one business day after the request is logged into AIMS. The acknowledgment letter also notifies the requestor that FDA will respond to the request as soon as possible, and invites the requestor to contact FDA at a designated phone number and address if the requestor has any questions related to the request. The same process took place under the OC APPS system, the only difference being that the acknowledgment letter was generated manually by the FOI technician.

CHRONOLOGY OF EVENTS

10. On June 28, 2007, DFOI received a FOIA request from the Government Accountability Project (plaintiff), dated June 27, 2007. Consistent with DFOI practice, an FOI technician logged the request into AIMS, and assigned it reference number 2007-6023, reflecting

that it was the 6023rd FOIA request FDA received in 2007. See Letter from Plaintiff to FDA with stamped reference number (dated June 27, 2007), Ex. 1.

11. On June 28, 2007, FDA sent plaintiff an acknowledgment letter with respect to this FOIA request.

12. DFOI immediately forwarded plaintiff's request to the Division of Information and Disclosure Policy ("DIDP"), of FDA's Center for Drug Evaluation and Research ("CDER") on June 28, 2007. DFOI referred plaintiff's request to CDER DIDP because the request sought documents relating to Ciprofloxacin, a drug regulated by CDER, and thus CDER is the office most likely to have responsive documents.

13. By letter dated August 3, 2007, plaintiff submitted a "Freedom of Information Act Appeal" to the Department of Health and Human Services wherein plaintiff appealed the "constructive denial of a June 27, 2007 request" under FOIA. See Letter from Plaintiff to Dep't of Health and Human Servs. (Aug. 3, 2007), Ex. 2.

14. On August 6, 2007, the Department of Health and Human Services (Public Health Service, Freedom of Information Office) notified plaintiff that its administrative appeal had been received and that it had been assigned number PHS-2K7-A-122.[1] See Compl. ¶ 11.

15. On September 25, 2007, plaintiff filed the Complaint in this case.

16. To date, FDA has not issued a letter to plaintiff denying its request for records; the request is still pending at CDER and will be processed when it rises to the top of DIDP's complex queue. This process is explained in detail in the declaration of Nancy Sager, also filed

[1] On October 27, 2007, the DHHS Public Health Service Appeals Officer, Darlene Christian, unexpectedly passed away, which lead to a delay in the processing of appeals. The new appeals officer will begin serving at the end of this month.

in support of the government's motion for a stay.

17. FDA takes its responsibilities in the administration of its FOIA program very seriously. For example, in fiscal year 2007, FDA spent 14 million dollars and 93 staff years (i.e., the equivalent of 93 full-time employees) responding to FOI requests. But the personnel resources of FDA components are insufficient to keep up with the large number of requests received, as well as the increased complexity of these requests.

Pursuant to 28 U.S.C. § 1746, I declare under the penalty of perjury that the foregoing is true and correct.

FREDERICK J. SADLER
Director
Division of Freedom of Information
Office of Management Programs
Food and Drug Administration
U.S. Department of Health and Human Services

Executed on February 4th, 2008, in Rockville, Maryland.

# Exhibit 1

G·A·P GOVERNMENT•ACCOUNTABILITY•PROJECT

1612 K Street, NW, Suite 1100
Washington, D.C. 20006
Tel. 202.408.0034
Fax 202.408.9855
Email: gapdc@whistleblower.org
Website: www.whistleblower.org

June 27, 2007

VIA FACSIMILE: 301-443-1726
Freedom of Information Staff (HFI-35)
Food and Drug Administration, Rm. 12A-16
5600 Fishers Lane
Rockville, MD 20857

2007-6023
RECEIVED
JUN 28 2007
FDA DFOI (HFI-35)

Re: FOIA Request

Dear FOI Officer:

Pursuant to the Freedom of Information Act, 5 U.S.C. 552 and 21 C.F.R. § 20.20, we request access to and copies of the following information concerning the clinical studies submitted regarding the drug Ciprofloxacin (a/k/a Cipro):

1. **In electronic form, with description of program to read : All goniometry (joint angle motion measurement) data, including but not limited to, all passive range of motion of joints, by protocol, measured in degrees, recorded from all subjects and sorted by site or investigator number, subject or numeric identification number , the joints measured, the dates of measurement and information on the age of the subject at enrollment or first measurement in months or years, or birth month and year, pertaining to domestic and foreign clinical trial studies 1001169 and 100201; and**

2. **In paper form: all FDA Division of Scientific Investigations ("DSI") reports and records, domestic and outside of US, concerning all DSI inspections pertaining to clinical trial studies 1001169 and 100201.**

If any of the material covered by this request has been destroyed or removed, please provide all surrounding documentation including, but not limited to, a description of the action taken regarding the materials and justification for those actions taken. For any documents or portions you deny due to a specific FOIA exemption, please provide a detailed justification of your grounds for claiming such exemption, explaining why the exemption is relevant to the document or portion of the document withheld.

The Government Accountability Project requests that all fees incurred in connection with the attached request to the Department of Justice be waived, because "disclosure of the information is in the public interest and is not primarily in the commercial interest of the requester." 5 U.S.C. § 552 (a)(4)(A)(iii).

**The Requesters' Public Interest Status and History**

GAP is a non-profit, non-partisan, public interest organization chartered under IRS Code §501 (C)(3) as a non-profit, educational and charitable organization. We seek to serve the public through achieving governmental accountability by protecting and encouraging federal and corporate employees who observe or are victimized by wrongdoing, gross waste of public funds, threats to public health and safety, environmental contamination, corruption, abuse of the public trust and other abuses of power.

GAP accomplishes these goals primarily by conducting advocacy campaigns before Congress, through the media, and for the general public and by providing legal representation to whistleblowers to combat the retaliation they have suffered in exercising their right of occupational free speech. Our twin aims are to promote corporate and government accountability and to expose, investigate, and correct substantive problems that formed the basis of protected whistleblowing disclosures. GAP's role is well-recognized by the courts and, as an organization, has informational standing under the First Amendment protecting its receipt of disclosed information. *Taylor v. RTC.* 56 F.3d 1437 (D.C. Cir. 1995); *United States v. Garde*, 573 F. Supp. 604 (D.D.C. 1987); see, generally, *Virginia Pharmacy Bd. v. Virginia Consumer Council*, 425 U.S. 748, 756-57 (1976).

GAP has a nearly 30-year history of working in the public interest. GAP does not take individual cases based on the client's ability to pay, how much money GAP believes it can recover in legal fees through litigation or any other commercial interest. Rather, GAP takes cases of legitimately harassed whistleblowers, often pro-bono (without charge), that further public policy or legislative changes that make the law stronger for workers who witness and choose to tell the truth about corporate and taxpayer-financed wrongdoing and to pursue exposure and resolution of the wrongdoing. It is through this work and with the help of whistleblowers that GAP has, among other things, pushed for enactment of several whistleblower protection statutes, exposed unhealthy food at supermarket chains, pushed for independent reviews of the safety of the Alaska pipeline, exposed the threat of explosion in waste tanks at the Hanford nuclear site, and pushed for policy reform within numerous executive agencies. All this activity is done primarily with the interest of the public in mind.

Specifically, GAP's Drug Safety Program is working with whistleblowers and investigating issues throughout the industry. GAP's web site summarizes some of this work. Go to: http://www.whistleblower.org/template/page.cfm?page_id=126. Through the web site and work with interested members of various media outlets, GAP disseminates information it receives through investigations and legal challenges.

**Dissemination of the Requested Information**

In our efforts to eliminate fraud and illegality in the government, GAP works closely with Members of Congress, the media, and the public to alert them to such irregularities. The information requested will be used in connection with a campaign aimed at key decision-makers at the federal level, the general public, and self-selected subscribers.

The combined circulation and viewer-base of our national, regional, and self-subscribed outlets ensure that the information will, indeed, be widely distributed to diverse segments of the public who will benefit from the legal disclosures requested above. As a consequence, public understanding and trust of government operations will certainly be enhanced.

**Non-commercial Use of the Requested Information**

Disclosure of this information by GAP is in no way connected with any commercial interest since GAP is a non-profit, tax-exempt organization under § 501 (c)(3) of the IRS Code. The information we seek is crucial to advancing public knowledge and will not be put to any commercial use.

Please be reminded that under the Freedom of Information Act, we are entitled to a response to this request within twenty working days (**by July 26, 2007**). Should this request be denied for any reason, we ask that a detailed explanation be provided along with the name of the person to whom administrative appeals should be addressed.

Thank you in advance for your assistance and cooperation. Please contact me if you would like to discuss this request or require any additional information.

Sincerely,

Richard E. Condit
Senior Counsel
Tel. 202.408.0034 x. 142
Eml. richardc@whistleblower.org

# Exhibit 2

G·A·P GOVERNMENT•ACCOUNTABILITY•PROJECT

1612 K Street, NW, Suite 1100
Washington, D.C. 20006

Tel. 202.408.0034
Fax 202.408.9855

Email: gapdc@whistleblower.org
Website: www.whistleblower.org

August 3, 2007

2007 AUG -6 AM 9:19
RECEIVED BY
PHSFOI OFFICE

**VIA FACSIMILE: 301-443-1726**
Frederick Sadler
Director
Freedom of Information Office
Food and Drug Administration, Rm. 6-30
5600 Fishers Lane
Rockville, MD 20857

Re: FOIA Appeal

Dear Mr. Sadler:

Pursuant to the Freedom of Information Act, 5 U.S.C. § 552(a)(6)(A)(ii) this letter will serve as an appeal of FOIA request 2007-6023 (attached). This request was received by your office on June 27, 2007. The statutory deadline for providing the documents requested was July 26, 2007. To date, despite my correspondence on July 3rd and telephone inquiries, no schedule for the determination of GAP's request has been set and no documents have been released. Consequently, GAP considers the agency's failure to respond a constructive denial of both its FOIA request and request for a fee waiver.

As there are no legitimate bases for denying the records requested or the waiver of fees, GAP requests that FDA release the requested records as soon as possible.

Please be reminded that under the Act, GAP is entitled to a decision regarding this appeal within twenty working days (**by August 24, 2007**). Should this appeal be denied for any reason, GAP requests that a detailed explanation be provided along with the name of the person who made the decision.

Thank you in advance for your assistance and cooperation. Please contact me if you would like to discuss this appeal or require any additional information.

Sincerely,

Richard E. Condit
Senior Counsel
Tel. 202.408.0034 x. 142
Eml. richardc@whistleblower.org

Enc.s: (1) June 27, 2007 FOIA request
(2) June 28, 2007 FDA acknowledgement letter

September 5, 2007

Note to PHS Appeals Officer, Darlene Christian
From FDA Denials and Appeals Officer, Sarah Kotler
Re: PHS-2K7-A-122, Appeal from FDA FOI request file 2007-6023

This memorandum constitutes the Agency's response to the above-numbered appeal from a constructive denial. The requestor/appellant is the Government Accountability Project, a non-profit public interest organization.

Background

On June 27, 2007, Government Accountability Project (GAP) submitted an FOI request for information concerning clinical studies involving the drug Ciprofloxacin (Cipro). Specifically, the request seeks:

- All goniometry (joint angle motion measurement) data, including but not limited to, all passive range of motion of joints, by protocol, measured in degrees, recorded from all subjects and sorted by site or investigator number, subject or numeric identification number, the joints measured, the dates of measurement and information on the age of the subject at enrollment or first measurement in months or years, or birth month and year, pertaining to domestic and foreign clinical trials studies 1001169 and 100201; and

- All Division of Scientific Investigations reports and records, domestic and outside of the US, concerning all DSI inspections pertaining to clinical trial studies 100169 and 100201.

This request was received and logged by DFOI on June 28, 2007 and assigned to the Center for Drug Evaluation and Research (CDER). On July 3, 2007, GAP submitted a letter to DFOI inquiring whether FDA would respond to request 2007-6023 by July 26, 2007. On August 3, 2007, GAP submitted a letter appealing the constructive denial of its FOI request and its request for a fee waiver.

Analysis and Recommendation

(1) Appeal from Constructive Denial of Fee Waiver

GAP requested a waiver of fees in its request and follow-up letter of July 3. The FDA regulation regarding requests for waiver of fees does not require the agency to respond to a request for a fee waiver in any specific period of time. See 21 CFR 20.46. Therefore, while FDA believes that GAP is likely entitled to a fee waiver, it is standard agency practice that fee waivers are not adjudicated unless and until it is determined that fee for processing of the request exceeds the amount of money necessary to trigger the issuance of an invoice. See 21 CFR 20.45(b)(4). This amount is currently $25.

Accordingly, GAP's appeal from constructive denial of its request for a fee waiver should be denied.

(2) Appeal from Constructive Denial of FOI Request

The FOIA contains a general standard which provides that federal agencies must respond to document requests within twenty days. 5 U.S.C. § 552(a)(6)(A). However, courts have repeatedly held that when an agency can show: (1) a great number of requests and inadequate resources, and (2) good faith and due diligence in complying with requests by processing them on a first-in, first-out basis, the agency may take longer than twenty days to process the FOIA request.

As noted above, this request has been referred to CDER for processing. CDER satisfies these two requirements. First, CDER receives approximately 450 FOIA requests per month – the highest amount of new requests received by any operating center within the Agency. As a result, CDER has a FOIA backlog of approximately two years. Second, CDER uses a multitrack processing system (i.e. simple requests, complex requests, etc). CDER processes complex requests on a first-in-first-out basis. The requests at issue are considered "complex" because they will involve a search for responsive records and a disclosure review to redact any information exempted from disclosure under the FOIA.

Accordingly, CDER must take GAP's request in turn in to ensure fair treatment to all requesters. This appeal should be denied.

If you have any questions regarding this file, please contact me at (301)827-6551.

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| GOVERNMENT ACCOUNTABILITY PROJECT, | ) | |
| Plaintiff, | ) | |
| v. | ) | Civil Action No. 07-01702 (CKK) |
| U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES; U.S. FOOD AND DRUG ADMINISTRATION, | ) | |
| Defendants. | ) | |

ORDER

UPON CONSIDERATION of ***Defendants' Motion for an Open America Stay and Opposition to Plaintiff's Motion for Judgment on the Pleadings,*** any opposition thereto, and the entire record herein, and for good cause shown, it is by the Court this _______ day of _______________ 2008,

ORDERED that Defendants' motion shall be and is hereby granted, and thus, this case is stayed until August 19, 2009; and it is further

ORDERED that Plaintiff's Motion for Judgment on the Pleadings is denied; and it is further

ORDERED that the Parties shall file a joint status report by September 21, 2009 including a recommendation to facilitate further disposition of this suit (for example, a briefing schedule for the filing of dispositive motions);

SO ORDERED.

______________________________
UNITED STATES DISTRICT JUDGE

Copies to:

Beverly M. Russell
Assistant United States Attorney
United States Attorney's Office for the
District of Columbia
555 4th Street, N.W., Rm. E-4915
Washington, D.C. 20530

Richard E. Condit
Government Accountability Project
1612 K Street, N.W., Suite 1100
Washington, D.C. 20006