UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

GOVERNMENT ACCOUNTABILITY
PROJECT,

   Plaintiff,

     v.

U.S. DEPARTMENT OF HEALTH AND
HUMAN SERVICES; U.S. FOOD & DRUG
ADMINISTRATION,

   Defendants.

Civil No. 07-1702 (CKK)

**MEMORANDUM OPINION**
(August 4, 2008)

The above-captioned case arises out of a request filed by Plaintiff, Government Accountability Project ("GAP") pursuant to the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552 *et seq.*, seeking the disclosure and release of agency records consisting of clinical study data regarding the drug Ciprofloxacin ("Cipro"). After Plaintiff's FOIA request had been pending for eight months with no response, Plaintiff filed a Motion for Judgment on the Pleadings. Defendants, the United States Department of Health and Human Services ("HHS") and the United States Food and Drug Administration ("FDA"), oppose Plaintiff's motion and have filed their own motion for a stay pursuant to *Open America v. Watergate Special Prosecution*, 547 F.2d 605 (D.C. Cir. 1976). Defendants seek to stay the proceedings in this action until August 15, 2009 in order to allow Defendants to complete their review and release the documents responsive to Plaintiff's request. Plaintiff opposes Defendants' motion for a stay. The Court has thoroughly reviewed Plaintiff's [5] Motion for Judgment on the Pleadings,

Defendants' [7] Motion for an *Open America* Stay, supporting declarations and attached exhibits, Plaintiff's Opposition to Defendants' motion and Reply in support of its own motion, and Defendants' Reply in support of their motion, as well as the relevant statutes and case law. Based upon the foregoing, the Court concludes that Defendants have failed to demonstrate exceptional circumstances and due diligence sufficient to justify the stay they seek. Accordingly, the Court shall DENY Defendants' [7] Motion for *Open America* Stay and shall GRANT-IN-PART Plaintiff's [5] Motion for Judgment on the Pleadings insofar as it seeks a judgment that Defendants are required to process Plaintiff's FOIA request and release the documents on a rolling basis.

Although the Court concludes that Defendants have not established exceptional circumstances sufficient to warrant the eighteen-month stay they seek, the Court recognizes that Defendants are faced with a substantial backlog of pending FOIA requests and that Plaintiff's request is currently pending in the processing queue. Therefore, as set forth in the Order accompanying this Memorandum Opinion, the Court shall require Defendants to file a status report with the Court on or before September 5, 2008, advising the Court as to the volume of the requested records, where Plaintiff's FOIA request currently stands in the processing queue, i.e., the date by which Defendants expect to begin processing Plaintiff's FOIA request, and how long they expect it will take to process Plaintiff's request, so that the Court can set an appropriate processing schedule.

## I. BACKGROUND

Plaintiff Government Accountability Project is a non-profit advocacy organization that frequently requests access to agency records. Compl. ¶ 3. On June 27, 2007, GAP submitted a

FOIA request to the FDA, seeking records of clinical studies regarding Ciprofloxacin. *Id.* ¶ 5. Specifically, GAP requested "[a]ll goniometry (joint angle motion measurement) data . . . pertaining to domestic and foreign clinical trial studies 1001169 and 100201" and "all FDA Division of Scientific Investigations ("DSI") reports and records, domestic and outside of US, concerning all DSI inspections pertaining to clinical trial studies 1001169 and 100201." Compl. ¶ 6.

By letter dated June 28, 2007, the FDA acknowledged receipt of GAP's FOIA request. Compl. ¶ 7. The FDA forwarded GAP's request to the Division of Information Policy Disclosure ("DIDP"), of the Center for Drug Evaluation and Research ("CDER"). 2/4/08 Decl. of Frederick J. Sadler (hereinafter "Sadler Decl.") ¶ 12. CDER regulates Cipro, and was therefore determined to be most likely to have responsive documents. *Id.* DIDP comprises 28 full-time employees and two full-time contractors. 2/4/08 Decl. of Nancy B. Sager (hereinafter "Sager Decl.") ¶ 6. In processing FOIA requests, the CDER utilizes two processing tracks. *Id.* ¶ 8. CDER assigns requests to the "Simple Track" when the records "do not require DIDP personnel to redact documents, . . . the documents requested are publicly available, or it is apparent from the face of the request that the documents do not exist in CDER's records." *Id.* ¶ 9. When records are not readily available, CDER assigns FOIA requests to the slower "Complex Track." *Id.* ¶ 8. DIDP personnel generally process requests within each track on a first-in, first-out basis.[1] *Id.* Because

---

[1] An exception to this policy is made when a request that is low in the Complex Track queue seeks identical or very similar records to another request that has reached the top of the queue. Sager Decl. ¶ 11. In that situation, in the course of processing the request at the top of the queue, DIDP may, in the interest of efficiency, release the overlapping records to parties who are further back in the queue. *Id.* DIDP is not aware of older requests that are similar to GAP's request for records. *Id.* ¶ 29.

the records GAP requested were not readily available and will likely require redaction and review once located, DIDP assigned GAP's request to the Complex Track. *Id.* ¶¶ 29-33.

Defendants have not provided a detailed estimate of when they anticipate GAP's FOIA request will be processed, nor have they provided an estimate as to the number of records likely to be responsive to GAP's request. Instead, Ms. Sager, the Director of DIDP, asserts that, "based on DIDP's current backlog and current processing time for requests seeking this type of information," "DIDP estimates that [GAP's] request will move to the head of the Complex Track approximately 16 months from the date of [Ms. Sager's] Declaration," i.e., in June 2009. *Id.* ¶ 29. Ms. Sager further avers that "[i]t is impossible for DIDP to estimate precisely at this time the volume of responsive documents likely to be identified during the searches for this request . . . . However, in light of DIDP's experience with requests seeking similar types of information, DIDP estimates that it will require two months to process plaintiff's FOIA request once it rises to the head of the Complex Track." Sager Decl. ¶ 30.

GAP did not receive any documents responsive to its FOIA request within the 20-working-day time frame mandated by the FOIA, and filed an appeal of the constructive denial of its FOIA request with the FDA's Freedom of Information Office on August 3, 2007. Compl. ¶¶ 8-10. By letter dated August 6, 2007, HHS Public Health Service acknowledged receipt of GAP's appeal, but GAP has not received any information regarding the status of its appeal since then. *Id.* ¶ 11. On September 25, 2007, GAP filed its Complaint in this action. *Id.* ¶ 13. On January 29, 2008, GAP filed its Motion for Judgment on the Pleadings.

In response, on February 19, 2008, Defendants filed their Motion for an *Open America* Stay and Opposition to Plaintiff's Motion for Judgment on the Pleadings. According to

Defendants, as of the date of that Motion, GAP's request remained pending in DIDP's Complex Track processing queue. Defs.' Mot. for an *Open America* Stay (hereinafter "Defs.' Mot.") at 4. Both Plaintiff's Motion for Judgment on the Pleadings and Defendants' Motion for an *Open America* Stay are now ripe for review.

## II. DISCUSSION

*A.     Legal Standard*

Under Section 552(a)(6)(C)(I) of the FOIA, the Government may obtain a stay of proceedings if it "can show exceptional circumstances exist and that the agency is exercising due diligence in responding to the [FOIA] request." 5 U.S.C. § 552(a)(6)(C)(I). In *Open America*, the D.C. Circuit addressed Section 552(a)(6)(C)(I) and found that an agency is entitled to additional time under FOIA's "exceptional circumstances" provision when the agency:

> is deluged with a volume of requests for information vastly in excess of that anticipated by Congress, when the existing resources are inadequate to deal with the volume of such requests within the time limits of subsection (6)(A), and when the agency can show that it "is exercising due diligence" in processing the requests.

547 F.2d at 616 (quoting 5 U.S.C. § 552(a)(6)(C)). Effective October 2, 1997, as part of the EFOIA, Congress added the following two subsections to Section 552(a)(6)(C):

> (ii)    For purposes of this subparagraph, the term "exceptional circumstances" does not include a delay that results from a predictable agency workload of requests under this section, unless the agency demonstrates reasonable progress in reducing its backlog of pending requests.
>
> (iii)   Refusal by a person to reasonably modify the scope of a request or arrange an alternative time frame for processing a request (or a modified request) under clause (ii) after being given an opportunity to do so by the agency to whom the person made the request shall be considered as a factor in determining whether exceptional circumstances exist for purposes of this subparagraph.

5 U.S.C. § 552(a)(6)(C)(ii), (iii). The legislative history of the 1996 amendments reveals that

Congress, having considered the decision in *Open America*, intended the amendments to be "consistent with the holding in *Open America*," and sought only to "clarify that routine, predictable agency backlogs for FOIA requests do not constitute exceptional circumstances." H.R. Rep. 104-795 at 24 (1996), *reprinted in* 1996 U.S.C.C.A.N. 3448, 3467; *see also Leadership Conference on Civil Rights v. Gonzales*, 404 F. Supp. 2d 246, 259 n.4 (D.D.C. 2005) ("An agency must show more than a great number of requests to establish[] exceptional circumstances under the FOIA.").

      However, the amendments clearly contemplate that other circumstances, such as an agency's efforts to reduce the number of pending requests, the amount of classified material, the size and complexity of other requests processed by the agency, the resources being devoted to the declassification of classified material of public interest, and the number of requests for records by courts or administrative tribunals, are relevant to the court's determination as to whether exceptional circumstances exist. H.R. Rep. 104-795 at 24 (1996), *reprinted in* 1996 U.S.C.C.A.N. 3448, 3467. Additionally, "where an agency is making good faith efforts and exercising due diligence in processing requests on a first-in, first-out basis," courts in this circuit have authorized a stay of proceedings "so long as the agency also demonstrates reasonable progress in reducing its backlog of pending requests." *Ctr. for Pub. Integrity v. Dep't of State*, 2006 WL 1073066, *2 (D.D.C. 2006) (citing *Appleton v. FDA*, 254 F. Supp. 2d 6, 9-10 & n.4 (D.D.C. 2003); *Wilderness Soc'y v. Dep't of the Interior*, 2005 WL 3276256, *6 (D.D.C. 2005)) (internal quotations omitted).

      When considering a request for an *Open America* stay, "[a]gency affidavits are accorded a presumption of good faith, which cannot be rebutted by purely speculative claims." *Safecard*

*Services, Inc. v. Securities and Exchange Commission*, 926 F.2d 1197, 1200 (D.C. Cir. 1991) (citations and internal quotation marks omitted).

      B.      *Exceptional Circumstances*

As the D.C. Circuit explained in *Open America*, "exceptional circumstances" exist when an agency faces an unexpected volume of requests for information and has insufficient resources to deal with those requests in the time frames set forth in the FOIA. *Open America*, 547 F.2d at 616 (quoting 5 U.S.C. § 552(a)(6)(C)). Exceptional circumstances, however, do not exist where "a delay. . . results from a predictable agency workload of requests under this section, unless the agency demonstrates reasonable progress in reducing its backlog of pending requests." 5 U.S.C. § 552(a)(6)(C)(ii). These factors thus frame the Court's consideration of Defendants' claim that they are operating under exceptional circumstances that justify a stay of proceedings. Defs.' Mot. at 9-18.

According to Defendants, DIDP received 5,310 FOIA requests in 2003; 5,156 requests in 2004; 4,050 requests in 2005; 3,335 requests in 2006; and 2,888 requests in 2007. Defs.' Mot. at 10 (citing Sager Decl. ¶ 16). Further, during 2007, DIDP received an average of 240 FOIA requests per month, down from 285 per month in 2006. *Id.* at 11; Sager Decl. ¶ 17. Pointing to this downward trend in FOIA requests, GAP challenges Defendants' claim that they are facing exceptional circumstances, noting that according to Defendants' own figures, DIDP is receiving 54% fewer requests than it did four years ago. Pl.'s Opp'n at 3. GAP contends that this decline in FOIA activity precludes Defendants from showing that DIDP is "deluged with a volume of requests for information vastly in excess of that anticipated by Congress." *Id.* at 2 (quoting *Open America*, 547 F.2d at 616). GAP is certainly correct that the downward trend in the number of

DIDP FOIA requests, at first blush, suggests that the agency is not facing an unexpected volume of requests for information.

Defendants, however, argue that the number of FOIA requests handled by DIDP is "somewhat misleading because it does not reflect the size and complexity of the requests received, or DIDP's backlog," and because "many of the requests actually contain multiple individual requests for documents." Defs.' Mot. at 11; *See id.* at 9-12; Sager Decl. ¶¶ 17-19 Specifically, Defendants contend that processing time is prolonged because "the vast majority of CDER documents that are responsive to FOIA requests include information that is exempt from disclosure as trade secret information, confidential commercial information, personal privacy information and/or deliberative process information." Defs.' Mot. at 10 (footnotes omitted). The Court is sensitive to the fact that DIDP processes large and complex FOIA requests, and these considerations are relevant in determining whether Defendants have demonstrated exceptional circumstances. Defendants' arguments (and Ms. Sager's Declaration), however, do not suggest that the FOIA requests DIDP is processing have become increasingly or unexpectedly more complex as of late. *See* 5 U.S.C. § 552(a)(6)(C)(ii) ("[T]he term "exceptional circumstances" does not include a delay that results from a predictable agency workload . . . ."). Nor do Defendants suggest that requesters have only recently or unexpectedly begun including multiple requests in a single FOIA request. As such, the incoming FOIA requests facing DIDP do not appear to be a "deluge" of new requests, but rather appear to be, as Defendants themselves describe, a "stream of new FOIA requests," Defs.' Mot. at 18, and one that is actually decreasing over time.

To their credit, in their Motion for an *Open America* Stay, Defendants bring to the

8

Court's attention three recent opinions from district courts in the Second and Third Circuits denying FDA requests for *Open America* stays: *Jerome Stevens Pharmaceuticals, Inc. v. FDA*, No. 07-cv-01985-(ADS) (AKT), Slip Op. (E.D.N.Y. Jan. 12, 2008); *Weinberg v. Von Eschenbach*, Civ. Case No. 07-1819 (FSH), Slip Op. (D.N.J. Oct. 10, 2007); and *Bloomberg, L.P. v. FDA*, 500 F. Supp. 2d 371 (S.D.N.Y. 2007). In each of these cases, the court considered strikingly similar arguments to those advanced by Defendants in this case, and in each, the court concluded that the FDA had not established the exceptional circumstances and due diligence necessary for an *Open America* stay. Significantly, in each case, the support for the FDA's arguments appears to have come in the form of a declaration supplied by Ms. Sager that set forth the same figures for DIDP's workload that she proffers in this case. While those cases are not binding on this Court, they are highly persuasive in light of their overwhelming similarity to the instant case. In particular, in *Bloomberg*, Judge Victor Marrero concluded, based upon the same declining trend set forth above, that Defendants'

> evidence is reflective, not of an unpredicted spike in requests, but rather of a manageable workload flow encountered in the due course of FOIA request processing. Thus, allowing a mere showing of a normal backlog of requests to constitute 'exceptional circumstances' would render the concept and its underlying Congressional intent meaningless.

500 F. Supp. 2d at 374-75 (citing *Ross v. Reno*, No. 95-CV-1088, 1996 WL 612457, at *5 (E.D.N.Y. Aug. 13, 1996) and *Fiduccia v. Dep't of Justice*, 185 F.3d 1035, 1041 (9th Cir. 1999)); *see also Jerome Stevens*, Slip Op. at 12-13; *Weinberg*, Slip Op. at 5.

The Court agrees with the other district courts that have considered the issue and concluded that DIDP's declining workload of FOIA cases does not, in and of itself, establish the type of exceptional circumstances necessary to warrant a stay. Defendants, however, argue that

9

DIDP faces extraordinary circumstances because, in addition to the ordinary incoming FOIA requests, it faces "multiple FOIA lawsuits, third-party subpoenas . . . and discovery requests in litigation matters," Defs.' Mot. at 12, "a significant and unanticipated increase in the resources that DIDP must devote to responding to document requests made by Congress," *id.* at 14; Sager Decl. ¶ 22, and additional responsibilities as a result of EFOIA, Executive Order 13,392[2] and the FDAAA,[3] Defs.' Mot. at 15-18.  According to Defendants, these responsibilities have diverted DIDP personnel from processing FOIA requests.  *See id.* at 12-18.

In her Declaration, Ms. Sager asserts that a "huge part of DIDP's workload recently has been a significant and unanticipated increase since 2004 in the resources it devotes to document requests made by Congress," and describes two particular requests handled by DIDP between August 2004 and August 2005 and May and July 2006.  Sager Decl. ¶ 22.  By Ms. Sager's own admission, however, DIDP has been facing increased Congressional requests for information since 2004, i.e., for at least four years.  As such, by this point, Congressional requests appear to be more of a predictable agency workload than a deluge of unanticipated responsibility.  Further, as Judge Marrero pointed out in response to a similar argument in *Bloomberg*, "responding to

---

[2]On December 14, 2005, the President issued this order, entitled Improving Agency Disclosure of Information.  According to Defendants, "E.O. 13,392 encourages federal agencies to increase the dissemination of records to the public without the need for a FOIA request."  Defs.' Mot. at 15-16 n. 14.

[3]On September 27, 2007, the President signed into law the Food and Drug Administration Amendments Act of 2007. Pub. L. No. 110-85, 121 Stat. 823.  According to the Defendants, the "FDAAA gave FDA new authority and obligations regarding the new drug and biologic review process and the monitoring of drug safety after products are being marketed.  FDAAA also reauthorized key programs pertaining to the testing and approval of drug and biological products in children.  All of these provisions of FDAAA have resulted in new or increased obligations for DIDP, some of which must be immediately implemented, and some of which must be implemented over the next six months."  Defs.' Mot. at 17.

Congressional document requests [] is, according to the Government's submissions, situational and often timelimited," and "DIDP does not detail an *existing* request [as opposed to a past request] that has overwhelmed its resources and staff." 500 F. Supp. 2d at 375 (emphasis added and footnote omitted).

Similarly, while Ms. Sager's Declaration explains that DIDP processed a number of large document productions arising out of litigation during 2007, she also explains that many of those productions had been pending for some time, and that they were handled by five full-time employees. *See* Sager Decl. ¶ 21. As such, Ms. Sager's Declaration does not establish that the litigation requests DIDP handled during 2007 constituted an unpredictable agency workload, or that DIDP's resources were insufficient to handle the work. Significantly, because Defendants do not provide the Court with any sense of whether DIDP faced or handled similar litigation requests in previous years, the Court cannot determine whether the 2007 litigation requests were unusual.[4] Moreover, even if DIDP faced heightened litigation requests in 2007, because those requests were coupled with a decrease in FOIA requests over previous years, the Court cannot evaluate how DIDP's current overall workload in 2008 compares with its workload in the past. In short, Defendants fail to establish that either litigation or Congressional requests for documents have led to the type of "extraordinary circumstances" (as opposed to predictable agency workload) required for an *Open America* stay.

Defendants also argue that DIDP's workload has increased because of DIDP's proactive attempts to reduce the number of FOIA requests it receives, pursuant to EFOIA and consistent

---

[4]Defendants cite DIDP review and production of over 30,000 pages in 2007 in response to litigation and subpoenas. Defs.' Mot. at 13-14. However, Defendants provide no data indicating the demand for similar review and production in previous years or in the current year.

with E.O. 13,392, by making "available tens of thousands of pages of documents each year regarding newly approved drugs, without regard for whether there is a FOIA request pending for those documents." Defs.' Mot. at 16; Sager Decl. ¶ 23. According to DIDP, this proactive approach in part explains the declining trend in incoming FOIA requests, but means that the decline in incoming requests has not led to a corresponding decline in workload because "DIDP spends the same amount of time reviewing and redacting these documents as it would if it had been responding to a FOIA request." Sager Decl. ¶ 23. At best, however, this argument suggests that DIDP's workload has not declined as its flow of incoming requests has declined, it does not suggest that DIDP has actually seen an increase in workload sufficient to establish exceptional circumstances.[5]

Finally, Defendants contend that they are faced with exceptional circumstances because DIDP has taken on new responsibilities mandated by the FDAAA as of September 27, 2007. Specifically, Defendants contend that, "[o]ver the past few months, six DIDP employees have been working on various projects related to the new disclosure requirements being implemented as part of the FDAAA . . . ." Defs.' Mot. at 17. The Court notes, however, that as Defendants explain it, DIDP's increased obligations under the FDAAA were to be implemented within the six months following September 27, 2007, i.e., by March 27, 2008. *See* Defs.' Mot. at 17. As such, it is not clear that DIDP's obligations in connection with the FDAAA represent a current

---

[5] Significantly, it appears that DIDP's level of proactive processing has remained relatively constant over the past four years. Defs.' Mot. at 16 ("DIDP proactively reviewed, redacted, and posted on FDA's website 1,003 approval letters, 107 approval packages, and 35 warning letters in 2004; 806 approval letters, 76 approval packages, and 41 warning letters in 2005; 1,108 approval letters, 99 approval packages, and 35 warning letters in 2006; and 1,115 approval letters, 92 approval packages, and 51 warning letters in 2007.") (citing Sager Decl. ¶ 23).

tax on its resources. Further, even if this is the case, Defendants also assert that DIDP's staffing level has increased from 18 in 2003 to 30 at the present time, and that "DIDP plans to hire approximately six more full-time employees in the near future." *Id.* at 21; Sager Decl. ¶ 27(c). The Court is sensitive to Defendants' argument that hiring new employees "generally does not immediately result in decreased processing times," *id.*; however, the fact remains that Defendants do not describe a situation in which DIDP's staffing levels have dropped precipitously at the same time that the agency has faced an increased workload. *Cf. Elec. Frontier Found. v. Dep't of Justice*, 517 F. Supp. 2d 111, 115-16 (D.D.C. 2007) (finding that an agency was experiencing exceptional circumstances where it remained "115 positions under its funded staffing level" and could not remedy this because of a hiring freeze). In short, it appears that DIDP's staffing level has increased dramatically over the past five years, and that its overall workload of incoming FOIA requests combined with other responsibilities has not. As such, Defendants have described a "predictable agency workload of requests," of the type that does not constitute extraordinary circumstances "unless the agency demonstrates reasonable progress in reducing its backlog of pending requests." 5 U.S.C. § 552(a)(6)(C)(ii). The Court therefore considers the latter criterion, along with Defendants' claims that they are exercising due diligence in responding to FOIA requests.

    C.    *Due Diligence*

As set forth above, where an agency's dely is the result of an predictable backlog of requests, the agency must demonstrate that it is making "reasonable progress in reducing its backlog of pending requests" in order to establish extraordinary circumstances. 5 U.S.C. § 552(a)(6)(C)(ii). Moreover, as a general principle under the FOIA, an agency is only entitled to a

stay of proceedings if it demonstrates that it is "exercising due diligence" in processing requests. *See id.* § 552(a)(6)(C). Here, Defendants assert that they meet both requirements. Specifically, Defendants point out that they have reduced their backlog of FOIA requests from 6,783 requests in August 2003 to 3,420 requests as of January 2008. Def.'s Mot. at 24; Sager Decl. ¶ 26. Defendants attribute this reduction to a variety of measures, including: a new electronic filing system, hiring more employees, posting more information on DIDP's website, reaching out to frequent FOIA requesters, and consolidating three tracking systems for FOIA requests into one agency-wide system. Defs.' Mot. at 20-24; Sager Decl. ¶¶ 26-27.

      The Court certainly commends Defendants for the steps they have taken. However, as Judge Marrero explained in *Bloomberg* when faced with a very similar claim that DIDP had made "reasonable progress" in reducing its backlog of pending requests, "the roughly equivalent decline in FOIA requests during the same period raises some questions about the Government's assertion of effectiveness." 500 F.2d at 375-76. According to Defendants, DIDP's backlog decreased by approximately 50% between August 2003 and January 2008. *See* Sager Decl. ¶ 26. At the same time, however, as discussed above, DIDP's level of incoming requests decreased from 5,310 in 2003 to 2,888 in 2007, i.e., by approximately 54%. *Id.* ¶ 16. Faced with a similar corollary, Judge Marrero concluded that "[i]n light of this data, the fairly general submissions by the Government do not make explicit the link between broad agency changes and specific workload reduction efforts targeted at decreasing its FOIA request backlog and as such, are not sufficiently indicative of due diligence under the circumstances presented by this case." *Bloomberg*, 500 F. Supp. 2d at 376; *see also Jerome Stevens*, Slip Op. at 13-14. So too, here, the Court cannot determine whether the decrease in DIDP's backlog is attributable to the measures

Defendants have undertaken or to the decrease in incoming FOIA requests, and therefore cannot conclude that Defendants have made "reasonable progress" in reducing their backlog of FOIA requests.

Defendants do employ a "first-in, first-out" policy for handling FOIA requests, which has been "adopted by the D.C. Circuit as [a] sufficient showing of due diligence." *Edmond v. United States Attorney*, 959 F. Supp 1, 3 (D.D.C. 1997) (citing *Open America*, 547 F.2d at 614-16). This method, coupled with the multitrack processing system used by DIDP, and the general efforts towards improving FOIA request processing discussed above, suggest that DIDP is exercising due diligence in processing FOIA requests, as a general matter. Defendants' showing of due diligence as to GAP's FOIA request, however, is far less impressive.

In the eight months between GAP's FOIA request and its Motion for Judgment on the Pleadings, Defendants "sent an acknowledgment letter to Plaintiff with agency contact information and forwarded the request to the office likely to have responsive documents." Defs.' Mot. at 19 (citing Sadler Decl. ¶ 10-14; Sager Decl. ¶ 28-29). Defendants also acknowledged receipt of GAP's appeal, but did not provide GAP with any further information regarding the timeline for processing its FOIA request or its appeal. Compl. ¶ 11. Moreover, in their October 31, 2007 Answer to Plaintiff's Complaint, Defendants asserted that they faced "exceptional circumstances and [were] exercising due diligence in responding to plaintiff's FOIA request," and therefore were "entitled to, and [would] be requesting, a stay of proceedings in this matter pursuant to 5 U.S.C. § 552(a)(6)(C)." *See* Docket No. [40] at 3. Nevertheless, Defendants did not file such a motion until February 19, 2008, and did so only in response to GAP's January 29, 2008 Motion for Judgment on the Pleadings. While Defendants are correct that neither the FOIA

15

nor the relevant case law imposes a filing deadline for agencies seeking *Open America* stays, Defs.' Reply at 2, Defendants' conduct in responding to GAP's FOIA request, as opposed to FOIA requests in general, cannot be described as a model of due diligence.

### III. CONCLUSION

For the foregoing reasons, the Court shall DENY Defendants' [7] Motion For an *Open America* Stay and shall GRANT-IN-PART Plaintiff's [5] Motion for Judgment on the Pleadings insofar as it seeks a judgment that Defendants are required to process Plaintiff's FOIA request and release the documents on a rolling basis. In recognition of the substantial backlog of pending FOIA requests facing DIDP, and DIDP's system for processing those requests, the Court shall not order Defendants to produce documents responsive to Plaintiff's FOIA request forthwith. Instead, as set forth in the Order accompanying this Memorandum Opinion, the Court shall require Defendants to file a status report with the Court on or before September 5, 2008, advising the Court as to the volume of the requested records, where Plaintiff's FOIA request currently stands in the processing queue, i.e., the date by which Defendants expect to begin processing Plaintiff's FOIA request, and how long they expect it will take to process Plaintiff's request, so that the Court can set an appropriate processing schedule.


Date:   August 4, 2008

                                    /s/
                                    COLLEEN KOLLAR-KOTELLY
                                    United States District Judge